Kelly A. Booth, M.D.,

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION


IN RE: BOSTON SCIENTIFIC CORP.,      MDL NO. 2326
PELVIC REPAIR SYSTEM
PRODUCTS LIABILITY LITIGATION


THIS DOCUMENT RELATES TO

HANNA WILKERSON,

            Plaintiffs,

     vs.
                              Case No.
BOSTON SCIENTIFIC              2:13-cv-4505

CORPORATION,

            Defendant.



    Videotaped Deposition of Kelly A. Booth, M.D.
          Thursday, November 13, 2014
          Huntersville, North Carolina
             At 12:35 p.m.


Reported By:   LeShaunda D. Cass-Byrd, CSR, RPR






        Golkow Technologies, Inc.
   877.370.3377ph|917.591.5672 fax
          Deps@golkow.com

EXHIBIT

C

Kelly A. Booth, M.D.,

Page 19

1    the day or where the Depends pads or something like

2    that for incontinence or severity of bulge and

3    pressure discomfort, there is a different level of

4    tolerance, depending on the individual patient.  So

5    how to parse out whether the patient is leaning

6    towards a surgical plan versus a medical plan, is has

7    a lot to do with what the individual desires.

8         Q.     And if -- if a patient appears to be a

9    surgical candidate, what are some of the options that

10   you would offer to her?

11        A.     Well, the standard of care is -- for

12   urinary incontinence is a tension-free vaginal tape.

13   In patients that have no symptoms, and you find on

14   exam -- you just so happen to find the laxity of the

15   bladder, the posterior compartment, or at the apex

16   some decent.  And they are not having symptoms, you

17   don't -- you don't -- you may say, "Oh, you might --

18   your bladder is falling just a little bit."  But you

19   don't move towards offering them any kind of surgical

20   management if they are not systematic.

21             But from the standpoint of urinary

22   incontinence, the gold standard is -- now, it can just

23   be vaginal tape.  And I came along in the days of

24   using a Burch procedure retropubic sling.  Did Burch

25   procedures laparoscopically and open -- for the most

Page 20

1   part, open -- at Duke.

2           And when I came here, continued to do them

3   until it was an accepted and gold standard

4   literature-proven way to decrease complications and

5   improve outcomes, long term, by using the tension-free

6   tape.

7           Now, for years, the urologists had been

8   doing slings and whatnot.  But they were not doing

9   them tension free, and so the outcomes for retention

10  and all were very high.  So it was something that we

11  kind of watched and waited until good data came out.

12          And as it became accepted gold standard,

13  then the tension-free tape surpassed the -- the Burch

14  procedure as the recommended standard of care by our

15  college, ACOG.  So...

16      Q.      And is that still true today?

17      A.      Yes.

18      Q.      When you use the term "tension-free vaginal

19  tape," is that a generic term that encompasses

20  different brands?

21      A.      Yes.

22      Q.      And would the Advantage Fit fall within

23  that description?

24      A.      Yes.

25      Q.      Let me go back a little bit to your

Kelly A. Booth, M.D.,

Page 36

1    but -- but do not have urinary incontinence from

2    detachment of the urethra or a drainpipe or ISD

3    urethra, intrinsic sphincteric deficiency.

4         So urodynamics do a wonderful job of

5    teasing that out, to be certain that we are not

6    providing a surgical option for somebody that would be

7    better served with a medical option.

8    Q.    Okay.  And we will talk about the

9    urodynamics in a minute.  But finishing out this

10   record, you wrote, She needs anterior compartment

11   repair.  What do you mean by that?

12   A.    An anterior repair.  Basically, anterior

13   colporrhaphy, which is to plicate the fascial tissue.

14   Almost like the repair of a hernia on the abdominal

15   wall, to basically bring the strong tissue together

16   and reduce the hernia back where it belongs.

17   Q.    And it looks like you discussed with her

18   that -- the repair that you thought that she would

19   likely need and the tension-free vaginal tape, but you

20   wanted her to go to get the urodynamics first; is that

21   correct?

22   A.    Right.

23   Q.    You noted that you spent 45 minutes

24   face-to-face time with the patient, greater than 40

25   percent of that in counselling and coordination of

Kelly A. Booth, M.D.,

Page 37

1    care.  Does that mean that you spent greater than 50

2    percent of that time actually talking with

3    Ms. Wilkerson?

4         A.     Yes.

5         Q.     And in the conversation that you had with

6    her, did you explain the interior repair and the use

7    of the tension-free vaginal tape?

8         A.     We talked about that.  And we talked about

9    why I thought the -- usually would discuss why I

10   thought that the leakage got better with time, just to

11   sort of explain the physiology of why she noticed the

12   bulge get worse but the leakage got better.  Because

13   that is confusing to patients.

14              And then they say, "Well, why do you want

15   to fix the incontinence if I'm not having an

16   incontinence problem?"

17              So -- and I -- you know, I think I probably

18   introduced that idea of a TVT, but wanted to go into

19   greater detail with her about that at a later time.

20   We -- since it's been a while and I don't have every

21   detail of what was discussed -- but I imagine that is

22   what I did.

23        Q.     That would have been consistent with your

24   usual practice?

25        A.     Absolutely.

Kelly A. Booth, M.D.,

Page 39

1   integrity.

2           So we eliminate the suspicion for intrinsic

3   sphincteric deficiency if the integrity of the urethra

4   is good.  But with the finding of the leak with

5   Valsalva at 300 cc's, that is consistent with genuine

6   urinary stress incontinence -- or stress urinary

7   incontinence, but without a intrinsic sphincteric

8   deficiency component.  So that basically indicates

9   that the leakage was just caused by detachment of the

10  urethra from the fascia.

11          So to -- to assist with that, once --

12  reducing that hernia, repairing that cystocele with an

13  anterior repair, if we left it at that, we would end

14  up with leakage.  So doing that would be doing her

15  dis- -- a disservice.  And I think then we -- when I

16  got these results, we discussed what would need to be

17  done to -- to assist with that.

18      Q.      So is it fair to say that the urodynamics

19  confirm what you suspected on your exam --

20      A.      Uh-huh (affirmative).

21      Q.      -- you expected to find this?

22      A.      Yes.

23      Q.      And confirmed your -- your preliminary plan

24  to do the anterior repair and use the TVT to support

25  her urethra?

Kelly A. Booth, M.D.,

Page 40

1        A.      Yes.

2        Q.      Okay.  And then she came back to see you on

3    February 12th, 2010?

4        A.      Yes.

5        Q.      And --

6        A.      To discuss the urodynamics.

7        Q.      -- and it looks like you spent the entire

8    visit in discussion with her rather than performing

9    any exams; is that correct?

10       A.      Right.

11       Q.      Because you wanted to spend some time doing

12   a detailed discussion of the surgical management that

13   were you proposing?

14       A.      Right.

15       Q.      And did you explain to her what you've just

16   explained to us about why she was not having leakage

17   but still needed a repair to the -- to the urethra --

18       A.      Yes.

19       Q.      -- or support?

20       A.      Yes.  Yes.

21       Q.      Do you remember Mrs. Wilkerson specifically

22   or --

23       A.      Uh-huh (affirmative).

24       Q.      -- are you relying on your records?

25               You remember her?

Kelly A. Booth, M.D.,

1      A.      Yeah, I do.

2      Q.      And under your plan you recorded that you

3  were going to proceed with the anterior repair and the

4  TVT and cystopathy.  We haven't talked about

5  cystopathy.  What does that mean?

6      A.      Cystopathy is performed after any anterior

7  repair and/or tension-free tape, in my practice.  And

8  really, probably likely, the majority of GYNs, to

9  confirm that there is no injury to the urethra or the

10  ureters or the bladder itself.  Because you are

11  operating basically in close proximity to all of the

12  structures of the bladder.

13           And cystopathy is performed at the

14  completion of both procedures to confirm that there is

15  no harm to those organs -- or that organ and the

16  ureters.

17           It is performed by taking a lighted scope

18  into the bladder and instilling normal saline into the

19  bladder -- or sterile water -- to look around and make

20  sure that there is no evidence of the sutures that you

21  have used to repair the prolapse or the tension-free

22  tape that you have used to secure the urethra into its

23  normal and natural angle.

24           And the way that the tension-free tape that

25  I typically use, the way that that is easy to discern

Kelly A. Booth, M.D.,

Page 42

1    is by looking laterally with a 70 degree cystoscope to

2    see if there is any evidence of the introducer.

3             So when the procedure is performed, the

4    introducer is basically left -- left there before the

5    cystopathy is complete, to confirm that there is no

6    mal placement of the tape.  And the tape itself is

7    contained within this introducer, which is a bright

8    blue color in the Advantage Fit device.

9             And if you look laterally on each side of

10   the bladder, you will not see the -- the blue color

11   and you will know that you are not -- you have not

12   penetrated or perforated the bladder with the tape.

13            And then at that point, the introducer can

14   be removed.  So we -- you know, we -- we can

15   fast-forward to the procedure.  Or I will wait for

16   your question.

17      Q.     Okay.  We will get there.  I just want to

18   finish going over what you discussed with her.

19      A.     Uh-huh (affirmative).

20      Q.     You documented that you reviewed with the

21   patient the risks of bleeding, infection, damage to

22   surrounding organs, including bladder, bowels and

23   ureters.  Is that something that you routinely do?

24      A.     Yes.

25      Q.     And did with Ms. Wilkerson?

Kelly A. Booth, M.D.,

Page 43

1     A.     Yes.

2     Q.     And you also discussed with her -- with her

3   the risk of a possible recurrence of her stress

4   incontinence.

5     A.     Yes.

6     Q.     And recurrence of her prolapse.

7     A.     Uh-huh (affirmative).

8     Q.     And mesh erosion.  What do you mean by

9   that?

10    A.     Mesh erosion is when the tape, the

11  tension-free tapes that are on the market are

12  basically seen as a foreign body by the -- by the

13  vagina.  And in some cases, they can be extruded

14  through the vagina and cause irritation, discomfort

15  with intercourse, vaginal discharge, some spotting or

16  bleeding.

17          And if that is to happen, it is something

18  that we talk about how it would be managed

19  postoperatively, if that were to happen.  And also

20  talk about the fact that it -- that could happen

21  remote from the time of -- of the procedure, and what

22  to watch out for symptom-wise if it were to happen.

23          And so we discussed that in great detail.

24  The -- I do discuss that the mesh, in the case of the

25  TVT, is a very limited site in the vagina where there

Kelly A. Booth, M.D.,

Page 44

1    is not a whole lot of area for the mesh to erode or

2    protrude and cause a problem.

3            So that if -- if it were to happen, we

4    discuss if -- that it might require another procedure,

5    either in the office or in the hospital, to help

6    either remove or just advance vagina over the mesh,

7    because it can be irritating.

8            Now, mesh erosion into the bladder is not

9    something that I have seen in the practice of using a

10   TVT and placing it properly, if the -- if the

11   cystopathy is negative.

12           So I suppose that erosion into the bladder

13   is something that is reported in cases.  But we

14   discuss mesh erosion related to the vagina because

15   that is the most common circumstance.  And that -- as

16   far as which way mesh would erode -- erode.

17           So anybody that is going to have placement

18   of a foreign body, a tension-free tape or

19   sacrocolpopexy, will be counseled on vaginal mesh --

20   mesh erosions and what the symptoms are of that so

21   they can watch out for it.

22      Q.    So that is something you went over with Ms.

23   Wilkerson?

24      A.    Yes.

25      Q.    And in the cases that you have you seen of

Kelly A. Booth, M.D.,

Page 45

1   mesh erosion, has that been something that you can

2   sometimes simply treat on outpatient basis?

3        A.      Yes.  Many of the cases respond well to

4   just vaginal estrogen cream, which causes advancement

5   of healthy mucosa.

6        Q.      And you also discussed with her the

7   possible risk of urinary retention as well?

8        A.      Yes.

9        Q.      And then you documented that knowing these

10  risks, the patient was willing to proceed and that you

11  answered her questions?

12       A.      Yes.

13       Q.      Okay.  And that you spent 30 minutes

14  face-to-face time with her, was greater than 50

15  percent of the time in counseling and coordinating?

16       A.      Yes.

17       Q.      So when you finished explaining these risks

18  to Ms. Wilkerson, you had informed her that she could

19  have a recurrence of both her prolapse and her stress

20  urinary incontinence.  You had explained that to her?

21       A.      Yes.  Yes.

22       Q.      And -- and as far as you can tell, she

23  understood that?

24       A.      Oh, yes.  Uh-huh (affirmative).

25       Q.      And I don't think this is in your chart.

Kelly A. Booth, M.D.,

Page 46

1    Let me just show you the consent form.

2              (Booth Exhibit 3 was marked for

3    identification.)

4    BY MS. PACKER:

5       Q.      Which comes from the hospital chart.  And I

6    apologize for the poor copy.

7       A.      Oh, it looks pretty good to me.  I have

8    seen worse.

9       Q.      So -- so -- so have we.

10             Is this a consent form that you or somebody

11   operating under your supervision or working under your

12   supervision had Ms. Wilkerson sign?

13      A.      Yes.

14      Q.      And who would have gone over this with her.

15   Do you know?

16      A.      Myself, and Susan Hales, who is our, at

17   that time, posting folks for surgery.

18      Q.      And so the signature at the bottom where it

19   says physician is your signature?

20      A.      Yes.

21      Q.      Okay.  So you went over with this in

22   addition to Susan?

23      A.      Yes.

24      Q.      And if she had had any questions, you would

25   have answered them?

Kelly A. Booth, M.D.,

Page 47

1       A.      Yes.

2       Q.      And then you asked the patient to sign and

3    initial on the bottom left; is that correct?

4       A.      Yes.

5       Q.      Okay.  Let's go now to the next thing that

6    happened, which I believe would have been the

7    procedure itself.

8       A.      Okay.

9       Q.      Do you have that note?

10      A.      I do.

11      Q.      And it looks like the -- the date of the

12   operation was March 9th, 2010.

13      A.      That is correct.

14      Q.      And so the consent form would have been

15   signed in your office on a prior preop visit?

16      A.      Right.

17      Q.      Okay.

18      A.      Which was February 12th, 2010.

19      Q.      Okay.  So referring to your operative note,

20   can you walk us through the procedure that you

21   performed?

22      A.      Sure.  The preoperative diagnosis is stress

23   urinary incontinence and a cystocele.  The procedures

24   described are tension-free vaginal tape cystopathy and

25   anterior colporrhaphy, also known as an anterior

Kelly A. Booth, M.D.,

Page 49

1      Q.      -- so where it says dilation, it should say

2  violation.

3      A.      Uh-huh (affirmative).

4      Q.      Okay.

5      A.      So then --

6      Q.      Let me stop you before you get any further.

7              Under description of the procedure it says:

8  Following detailed informed consent.  Did you review

9  the informed consent again before the surgery?

10     A.      Yes.  In the preoperative area, just to

11  make sure there is no further questions, oftentimes

12  with the significant other, if they were not able to

13  be there at the signing of the consent form in the

14  office.  That's just a standard of care, and we do

15  that with every single case -- or I do that with every

16  single case.  And it's actually required by the

17  hospital as well.

18     Q.      And would that discussion immediately prior

19  to surgery include a review of the potential risks and

20  complications, as you went over in your office before?

21     A.      Yes.  And answer any questions related to

22  those risks.

23     Q.      Okay.  You can go ahead and just walk us

24  through the procedure, if you would.

25     A.      So following detailed informed consent, the

Kelly A. Booth, M.D.,

Page 50

1    patient was taken in the operating room and placed in

2    the dorsal lithotomy position.  And after successful

3    general anesthesia was achieved, the patient was

4    placed in the Allen stirrups and sterilely prepped

5    vaginally and perineally, and draped in the usual

6    fashion.

7                In-and-out catheterization of the bladder

8    was performed and the weighted speculum was inserted

9    into the vagina.

10               The vaginal apex was grasped with Alex --

11   Allis clamps, and the cystocele was isolated and

12   evaluated.  Approximately 20 cc's or ml's of 1 percent

13   lidocaine with one and 200 concentration of

14   epinephrine was injected to the vaginal mucosa.

15               The vaginal mucosa was thin in size in the

16   midline, and the mucosa was dissected off the

17   underlying paravascular fascia using sharp dissection

18   with the Stroli scissors.

19               The midline defect was identified and a

20   series of interrupted imbricating sutures of 2-0

21   Vicryl were placed to plicate the perivascular fascia

22   in the midline.

23               The vaginal mucosa was then trimmed and

24   reapproximated, using 3-O Vicryl in a running, walking

25   fashion.  Through a separate incision in the

Kelly A. Booth, M.D.,

Page 51

1    mid-urethral area, the TVT mesh was introduced.

2            Once again, 1 percent lidocaine was

3    injected into the vaginal mucosa, and half percent

4    Marcaine injected to the space of Retzius at the sites

5    were trocars were to be placed.

6            These sites were marked, two-fingerbreadths

7    lateral to the midline, over the pubic symphysis.

8            The vaginal mucosa was undermined to the

9    urogenital diaphragm.  And using the Stroli scissors

10   in the Boston Scientific -- it says Align Fit, but

11   it's supposed to be Advantage Fit --

12       Q.    Okay.

13       A.    -- was assembled and placed through the

14   urogenital diaphragm.  The patient right -- it says

15   fifth trocar -- but right trocar was then directed to

16   the isolateral shoulder on the right side and exited

17   through the appropriate demarcation at the level of

18   pubic symphysis.

19            In a similar fashion, the trocar was

20   introduced through the patient's left urogenital

21   diaphragm.  And directing towards the -- the trocar

22   towards the demarcated site on the left pubic

23   symphysis, directing towards the lateral shoulder on

24   the left.

25            This trocar was introduced through the

Kelly A. Booth, M.D.,

Page 52

1    demarcated site.  One amp of indigo carmine had been

2    introduced by anesthesia and cystopathy was performed

3    to evaluate for any evidence of bladder injury.  Both

4    ureteral orifices were spilling indigo carmine-tinged

5    urine vigorously.

6            The Mayo scissors were placed beneath the

7    urethra as the mesh was drawn through the face of

8    Retzius and trimmed in order to allow no tension to be

9    placed on the mesh.

10           The vaginal mucosa was reapproximated over

11   the mesh, using a horizontal imbricating suture of 40

12   VICRYL.  Vaginal packing with Premarin cream was

13   placed and a Foley catheter was placed to straight

14   drain.

15           Of note, while the trocars were being

16   directed on both right and left side, the bladder was

17   deviated to the opposite side using the catheter guide

18   sheets in a Foley.  This maneuver was performed in

19   order to protect the bladder from injury.

20           At the completion of the case, all sponge,

21   needle, and instrument counts were correct times two

22   and the patient was awakened, excavated and taken to a

23   recovery room, alert and in stable condition.

24       Q.    Did this operation proceed without any

25   complications?

Kelly A. Booth, M.D.,

Page 77

1      Q.      Okay.

2      A.      I think that is so that she could get

3  breaks from her work to go to the office and do what

4  she needed to do.  Because frequently, when you do

5  have a pessary in place, you have to come back at

6  intervals of 10 to 12 weeks for removal, cleaning and

7  replacement of the pessary.  So it adds, you know, a

8  time commitment.

9      Q.      Right.  Do you believe that Ms. Wilkerson

10  was an appropriate candidate for this surgery that you

11  performed?

12     A.      Yes.

13     Q.      Including the TVT portion of the surgery?

14     A.      Yes.

15     Q.      And based on the last time that you saw her

16  and based upon the review the records of your

17  practice, do you believe that she was harmed in any

18  way by the mesh itself?

19             MR. CANTRELL:  Object to the form.

20  BY MS. PACKER:

21     Q.      He is objecting for the record, but you can

22  answer.

23     A.      Okay.  I do not believe that she was harmed

24  by the mesh at all.

25     Q.      And the complication that she did have was

Kelly A. Booth, M.D.,

Page 83

1    reputable resources to review before they decide to go

2    through with a TVT.

3            Now I don't offer the mesh kit repair,

4    along with the rest of my partners.  So...

5        Q.     With respect to the TVT repair, in your

6    experience, what has been your complication rate?

7        A.     Oh, extremely low.  The only -- I have not

8    had any bladder injuries or urethral injuries.  The

9    complaints of mesh erosion are numbering three or

10   four.  I'm trying to -- one was actually the same

11   patient.  So I would consider that four.  But it's

12   three patients.  But the erosion -- an erosion

13   occurred the second time on somebody that was very

14   atrophic in the vagina.

15           And as far as discomfort or pain,

16   recurrence of incontinence, it's been a -- a joy of a

17   procedure to perform, from the standpoint of minimal

18   complications and very -- so much better recovery than

19   a Burch procedure.  So it's been good, all-around

20   outcomes.

21       Q.     It's still a procedure that you perform on

22   patients today?

23       A.     Yes.  Yes.  And would advise a family

24   member to receive or -- yeah, absolutely.

25                (Booth Exhibit 6 was marked for

Kelly A. Booth, M.D.,

Page 84

1       identification.)

2  BY MS. PACKER:

3       Q.      Okay.  Let me show you what I have marked

4  as Exhibit 6, which is the directions for use -- make

5  sure I don't give you my highlighted copy -- the

6  directions for the Advantage Fit.  Is that a document

7  that you reviewed at some point in the past?

8       A.      Yes.

9       Q.      I assume it's not something --

10      A.      Prior to use.

11      Q.      -- you review every time.  But --

12      A.      No.

13      Q.      -- but when you first started using the

14  product?

15      A.      Yes.

16      Q.      And let me ask you, if you would, to turn

17  to the third page of the document.  Actually, the

18  fourth page, where it says, Adverse events.

19      A.      Okay.

20      Q.      Are -- and I will give you a second to read

21  it.  But are the adverse events that are listed here

22  all potential adverse events or complications that you

23  were aware of through your general knowledge as a

24  physician?

25      A.      Yes.

Kelly A. Booth, M.D.,

Page 85

1    Q.    So certainly you knew, from your own

2  experience, that there were potential risks of a -- a

3  pain or of failure of the procedure?

4    A.    Yes.

5    Q.    Okay.  Thank you.

6          In making the decision about what of -- I'm

7  moving away from that document now, Doctor.

8    A.    Okay.

9    Q.    In making a decision about whether you are

10 going to use a medical device or not in your patients,

11 we have already discussed CME training that you

12 received, literature, confirming with your colleagues.

13 Are there any other sources of information that you

14 would typically rely on in making a decision that I am

15 or am not going to use that particular medical device?

16   A.    I can't think of anything other than that.

17 I mean, conferences, like SGS, the Society for

18 Gynecologic Surgeons, would be an additional -- you

19 know, reputable conferences.  And that is about all I

20 can think of.

21   Q.    There has been some testimony in -- in this

22 mesh litigation, generally about materials safety data

23 sheet for the raw material that was used to make some

24 of the mesh.  Is that a type of document that you are

25 familiar with?

Page 94

1    something material to you.

2              MS. PACKER:  Objection to the form.

3    BY MR. CANTRELL:

4         Q.    Is that fair?

5         A.    That I could investigate it.  Okay.

6         Q.    Okay.  And you mentioned that -- a little

7    bit earlier, about the FDA approval of these devices.

8    And I -- I think you mentioned you just -- you got

9    some general knowledge about that process; is that

10   fair?

11        A.    Yes.

12        Q.    Okay.

13        A.    Enough knowledge to know the FDA fully

14   authorized the TVT application.  And then the other

15   mesh-kit type things seem to sort of grandfather under

16   that policy.  But, you know, mostly, if I'm going to

17   use something that is an implantable device, I want to

18   make sure that it's FDA approved.

19        Q.    All right.  Would you be surprised to learn

20   that there were no premarket clinical trials on the

21   Advantage Fit before its release?

22              MS. PACKER:  Objection.

23              THE WITNESS:  No, I wouldn't be.

24         Because if it's a similar mesh, then -- you

25            know, in other words, mesh makeup, et

Kelly A. Booth, M.D.,

Page 95

1          cetera, I would not be surprised by that.

2          Because at the first company that came out

3          with it I believe was Johnson & Johnson,

4          and most of the testing was probably done

5          on the Gynecare products, which basically

6          contain a similar -- similar fabric.  So...

7     BY MR. CANTRELL:

8        Q.      Okay.  Would it change your opinion to

9     learn that the first product on the market was

10    actually -- the first sling on the market was actually

11    a protogen, which was manufactured by Boston

12    Scientific, and was actually recalled from the market?

13             MS. PACKER:  Objection.

14    BY MR. CANTRELL:

15       Q.      Would that change your opinion, with that

16    knowledge in mind?

17       A.      No.  If it was recalled, it -- you know,

18    no.

19       Q.      Okay.  Fair enough.

20       A.      If I want to ask a question should it go

21    off the record?

22             MR. CANTRELL:  Probably so.  Yeah.

23             THE WITNESS:  Okay.

24             MR. CANTRELL:  Yeah.  Do you want to

25        take a quick break?

Kelly A. Booth, M.D.,

1    the FDA's inquiry, provided by a compatibility data,

2    would that be reassuring to you as a physician?

3        A.    Yes.

4        Q.    Would you rely on the FDA to make the

5    ultimate decision about approval of this device,

6    having considered the material safety data sheet and

7    Boston Scientific data as supplied to the FDA?

8        A.    Yes, that I would trust the FDA --

9        Q.    And --

10       A.    -- for that information.

11       Q.    And in your decision-making process as a

12   physician, you would rely on the FDA and you would

13   also rely on -- as you've used the term --

14   evidence-based literature?

15       A.    Yes.

16       Q.    And not on a -- one document that is a

17   manufacturing-related document; is that fair to say?

18       A.    Yes.  I would be just a little skeptical.

19   Not -- I mean, just because it's almost like one

20   little disclaimer.  And as I look at -- I don't know.

21   I mean, I -- I would definitely rely more on a body of

22   literature to tell me what outcomes were, then a -- a

23   disclaimer to basically throw the baby out with the

24   bath water, so to speak, just say, "Oh, well this has

25   got to be all bad," in the situation.  Because the

Kelly A. Booth, M.D.,

Page 100

1    chemical foundation or makeup of this device is not to

2    be used in the human body.  So I -- I wouldn't look at

3    this and say, "Oh, absolutely.  I'm not putting any

4    more TVTs in at all."

5       Q.      And from your knowledge of the literature,

6    is there a well-documented, long and safe use of

7    polypropylene for the purpose of TVT mesh?

8       A.      Yes.

9       Q.      And I believe you now have with you a copy

10   of your CV.  Can we mark that?

11      A.      Sure.  It's a little bit ancient.

12      Q.      That is okay.  You don't have any reason to

13   keep it current.

14      A.      That is right.  Not looking for a new job.

15              Yeah.  This is fine.  The only thing I say,

16   the ACOG member.  Oh, it's in here.  That is okay.

17   Good.  And then strike the AMA.  Sorry.

18      Q.      That is okay.  So you have gone -- gone

19   ahead and made that change?

20      A.      Yes.

21              (Booth Exhibit 8 was marked for

22        identification.)

23   BY MS. PACKER:

24      Q.      So Exhibit 8 is your CV --

25      A.      Do you want one of these?