Sanchez v. Boston Scientific Corp., Slip Copy (2014)

2014 WL 202787

2014 WL 202787
Only the Westlaw citation is currently available.
United States District Court, S.D. West Virginia.

Roseanne SANCHEZ, et al., Plaintiffs,
v.
BOSTON SCIENTIFIC CORPORATION,
Defendant.

Civil Action No. 2:12–cv–05762. | Jan. 17, 2014.

**Attorneys and Law Firms**

Clayton A. Clark, Jay W. Craddock, Scott A. Love, Clark Love & Hutson, Jim M. Perdue, Jr., W. Michael Moreland, Perdue Kidd & Vickery, Houston, TX, Derek H. Potts, Timothy L. Sifers, The Potts Law Firm, Kansas City, MO, for Plaintiffs.

Adrienne L. Hernandez, Eric M. Anielak, Heather A. Grossman, Jon A. Strongman, Kathleen A. Frazier, Mark C. Hegarty, Matthew D. Keenan, Robert T. Adams, Shook Hardy & Bacon, Kansas, MO, Eva Marie Mannoia Weiler, Lael Alyn Awong, Shook Hardy & Bacon, Irvine, CA, Hildy M. Sastre, Shook Hardy & Bacon, Miami, FL, Michael Bonasso, Flaherty Sensabaugh & Bonasso, Charleston, WV, for Defendant.

**MEMORANDUM OPINION AND ORDER**

**(Boston Scientific's Motion for Summary Judgment Based on the Statute of Limitations)**

JOSEPH R. GOODWIN, District Judge.

**\*1** Pending before the court is Boston Scientific Corporation's Motion for Summary Judgment Based on the Statute of Limitations [Docket 30]. Relying on California's two-year statute of limitations, Boston Scientific argues that Ms. Sanchez's claim is time-barred. In its supporting memorandum, Boston Scientific states that Ms. Sanchez underwent four revision surgeries more than two years before she filed this action. Boston Scientific claims these surgeries put Ms. Sanchez on actual or inquiry notice of her claim more than two years before filing suit. For the reasons stated below, Boston

Scientific's motion for summary judgment [Docket 30] is **DENIED.**

**I. Background**
This case is one of several thousand assigned to me by the Judicial Panel on Multidistrict Litigation and one of four (now three) bellwether cases set for trial pursuant to Pretrial Order # 54 [Docket 22]. These cases involve the use of transvaginal surgical mesh to treat pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI").

On January 13, 2010, Dr. Kerri Wiltchik, M.D., implanted Ms. Sanchez with a Pinnacle Pelvic Floor Repair Kit and an Advantage Transvaginal Mid–Urethal Sling System. (*See* Boston Scientific Corp.'s Mem. in Supp. of its Mot. for Summ. J. based on the Statute of Limitations, Exhibit A [Docket 30–1], at 85–87; Exhibit B [Docket 30–2], at 3).[1] The implantation surgery took place at Marian Medical Center in Santa Maria, California. (*See* Exhibit A [Docket 30–1], at 85). The products were implanted to treat Ms. Sanchez's SUI, POP, and cystocele. (Exhibit C [Docket 30–3], at 4).

According to Ms. Sanchez's plaintiff fact sheet, she first saw a health care provider for symptoms related to the mesh in February 2010. (Exhibit C [Docket 30–3], at 6). In addition, Ms. Sanchez's deposition testimony indicated that she was experiencing a pink-tinged discharge every day since the implantation surgery. (Exhibit E [Docket 30–5], Deposition of Roseanne Sanchez, at 21:1–15). Between her implantation surgery and her first revision surgery, Ms. Sanchez complained of vaginal discharge, itching, and abdominal cramping. (Exhibit A [Docket 30–1], at 50, 52).

On April 9, 2010, approximately four months after the implantation surgery, Ms. Sanchez told Dr. Wiltchik she was experiencing "abnormal vag[inal] bleeding scant with a pink discharge which causes her to wear a daily panty liner" and also felt "something scratchy like a stitch in her vagina."(Exhibit A [Docket 30–1], at 46). Dr. Wiltchik diagnosed Ms. Sanchez as having "complications due to genitourinary device, graft, and implant."*Id.* Dr. Wiltchik excised a small portion of the mesh and applied silver nitrate to the area. (Exhibit D [Docket 30–4], Deposition of Dr. Kerri Wiltchik, at 50:1–3). Dr. Wiltchik prescribed Vagifem tablets, which would help grow the mucosa over the exposed mesh areas and promote healing. (*Id.* at 185–86:24–3). Ms. Sanchez's medical records for that day indicate she understood "that a few treatments may be required before the exposed mesh areas are completely

covered and her symptoms resolve."(Exhibit A [Docket 30–1], at 46).

**\*2** On May 3, 2010 Dr. Wiltchik performed a second revision surgery. (Exhibit A [Docket 30–1], at 44). Dr. Wiltchik again concluded that Ms. Sanchez was suffering from "complications due to genitourinary device, graft, and implant," specifically, exposed mesh from the Pinnacle product. (*Id.;* Exhibit D [Docket 30–4], Deposition of Dr. Kerri Wiltchik, at 49:19–22).

By her May 20, 2010, visit with Dr. Wiltchik, Ms. Sanchez testified that she was experiencing pelvic cramping and discomfort, which she believed were related to vaginal infections, as well as incontinence symptoms. (Exhibit E [Docket 30–5], Deposition of Roseanne Sanchez, at 225:11–15). Dr. Wiltchik again assessed that Ms. Sanchez's symptoms stemmed from complications with the pelvic implants. (Exhibit A [Docket 30–1], at 43). Dr. Wiltchik prescribed Metrogel–Vaginal gel, which Ms. Sanchez testified did not improve her symptoms. (*Id.* at 43; Exhibit E [Docket 30–5], Deposition of Roseanne Sanchez, at 224:14–17).

On June 14, 2010, Ms. Sanchez again complained to Dr. Wiltchik that she was experiencing copious amounts of pink-tinged discharge. (Exhibit A [Docket 30–1], at 41). According to Ms. Sanchez's medical records, "her discharge was thought to be due to her exposed mesh."(*Id.*). After a lengthy discussion with Dr. Wiltchik, Ms. Sanchez agreed to undergo another revision surgery, this time under general anesthesia. (*Id.* at 42). Ms. Sanchez understood that the procedure would help stop the mesh from poking through her vaginal wall. (Exhibit E [Docket 30–5], Deposition of Roseanne Sanchez, at 230:3–6). On June 18, 2010, Dr. Wiltchik removed a large portion of exposed mesh. (Exhibit A [Docket 30–1], at 80). This was Ms. Sanchez's third revision surgery.

Despite these three revisions of the mesh and other treatments, Ms. Sanchez's symptoms did not improve. (*See id.* at 39, 35). On September 1, 2010, Ms. Sanchez reported to Dr. Wiltchik that she was experiencing abnormal vaginal bleeding, pink-tinged discharge, and discomfort with intercourse. (*Id.* at 35). The medical record for this date indicates Ms. Sanchez understood that "her symptoms are due to a small amount of exposed mesh."(*Id.*). For the fourth time, Dr. Wiltchik completed an in-office excision of the exposed mesh.(*Id.*). Later, on September 17, 2010, Ms. Sanchez agreed to undergo another revision surgery under anesthesia because her symptoms had not resolved.(*Id.* at 33).

According to the plaintiffs, during these medical visits,

Dr. Wiltchik never told Ms. Sanchez that her symptoms were related to a defect in the mesh. (*See* Pls.' Resp. in Opp'n to Boston Scientific Corp.'s Mot. for Summ. J. based on the Statute of Limitations [Docket 32], at 4). Ms. Sanchez testified that during one of her medical appointments, Dr. Wiltchik said, "[f]or one reason or another ... the skin was not healing over the mesh."(Exhibit E [Docket 30–5], Deposition of Roseanne Sanchez, at 221:11–13). According to Dr. Wiltchik's progress notes on May 11, 2011, she "discussed at length patient's reaction to mesh and propensity for body to expel mesh."(*See* Pls.' Resp. in Opp'n to Boston Scientific Corp.'s Mot. for Summ. J. based on the Statute of Limitations, Exhibit 3 [Docket 32–3], Deposition of Dr. Kerri Wiltchik, at 191:9–14).[2] Dr. Wiltchik told Ms. Sanchez she had "no idea why this was happening and for some reason [Ms. Sanchez's] body did not like" the mesh products. (*Id.* at 191:19–21). In addition, Dr. Wiltchik testified that she has never attributed the cause of Ms. Sanchez's symptoms to a defect in the mesh. (*See id.* at 223:17–21; 224:14–16, 23–25; 225:1–11).

**\*3** Ms. Sanchez's plaintiff fact sheet indicates she became aware that her injuries were related to a defect in the mesh implants in August 2011. (Exhibit C [Docket 30–3], at 6). According to the plaintiffs, Ms. Sanchez saw an advertisement for transvaginal mesh litigation on television, which caused her to seek representation. (*See* Exhibit 7 [Docket 32–7], at 28:5–16). However, Ms. Sanchez's deposition testimony reveals that she did not know the month or the year she saw the advertisement. (Exhibit A [Docket 34–1], at 36:10–16). On September 21, 2012, Ms. Sanchez directly filed suit in MDL 2326 pursuant to Pretrial Order # 12 [Docket 176].[3]

## II. Choice of Law

In multidistrict litigation cases, the choice-of-law determination for pre-trial motions hinges upon whether federal or state law governs. "When analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located. When considering questions of state law, however, the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation ."*In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.,* 97 F.3d 1050, 1055 (8th Cir.1996) (internal citations omitted); *see Toll Bros., Inc. v. Dryvit Sys., Inc.,* 432 F.3d 564, 568 n.4 (4th Cir.2005) (applying Connecticut state law in transferred multidistrict litigation case based on diversity jurisdiction and citing to *In re Temporomandibular (TMJ) Joint Implants Prods. Liab. Litig.,* 97 F.3d at 1055); *Bradley v. United States,* 161 F.3d 777, 782 n.4 (4th Cir.1998); *see*

Sanchez v. Boston Scientific Corp., Slip Copy (2014)

2014 WL 202787

*also*15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3866 (3d ed.2009).

This case is based on diversity jurisdiction. Federal law thus controls procedural issues and state law controls substantive issues. *Dixon v. Edwards,* 290 F.3d 690, 710 (4th Cir.2002). The standard for summary judgment is procedural; therefore, the federal standard applies. *Gen. Accident Fire & Life Assurance Co. v. Akzona, Inc.,* 622 F.2d 90, 93 n.5 (4th Cir.1980). In determining what state substantive law governs this dispute, I must first identify which choice-of-law rules to follow.

A majority of cases in an MDL are transferred from other forums pursuant to 28 U.S.C. § 1407. *See*William B. Rubenstein, *Newberg on Class Actions* § 10:29 (5th ed.2013). With respect to these transferred cases, courts routinely apply the choice-of-law of the originating forum. *See, e.g., In re Temporomandibular (TMJ) Joint Implants Prods. Liab. Litig.,* 97 F.3d at 1055;*see also Chang v. Baxter Healthcare Corp.,* 599 F.3d 728, 732 (7th Cir.2010) ("When a diversity case is transferred by the multidistrict litigation panel, the law applied is that of the jurisdiction from which the case was transferred....").

However, plaintiffs may bypass the transfer process by directly filing into the MDL. *See* Andrew D. Bradt, *The Shortest Distance: Direct Filing and Choice of Law in Multidistrict Litigation,* 88 Notre Dame L.Rev. 759, 794 (2012). Some cases are directly filed into the MDL and originate in the MDL court's judicial district. Others cases originate elsewhere and are directly filed into the MDL. *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,* MDL No. 2100, 2011 WL 1375011, at *4 (S.D.Ill. Apr. 12, 2011).

**\*4** The difficulty with the latter category of cases is there technically is no prior proper forum whose choice-of-law rules should apply. In addition, many direct filing orders indicate direct filing does not make the MDL court a "transferor court," and thus has no effect on choice-of-law. Bradt, *supra,* at 764;*see, e.g.,* Pretrial Order # 14 [Docket 196], at 3 ("This court shall not be deemed to be the 'transferor court' simply by virtue of the action having been directly filed into MDL No. 2326."). Without a prior proper forum and a disclaimer that direct filing does not affect choice-of-law, it may be difficult to determine which forum's choice-of-law should apply.

For cases that originate outside the MDL court's judicial district and are filed directly into the MDL, many courts apply the choice-of-law rules of the "originating jurisdiction." *In re Watson Fentanyl Patch Prods. Liab. Litig.,* MDL No. 2732, 2013 WL 4564927, at *2 (N.D.Ill.

Aug. 27, 2013) ("Indeed, the prevailing rule in this situation is that in a case that was directly filed in the MDL transferee court but that originated elsewhere, the law (including the choice of law rules) that applies is the law of the state where the case originated."); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,* 2011 WL 1375011, at *6 ("[T]he Court concludes that the better approach is to treat foreign direct filed cases as if they were transferred from a judicial district sitting in the state where the case originated.").*See generally Wahl v. Gen. Elec. Co.,* No. 3:13–CV–0329, 2013 WL 604818, at *4 (M.D.Tenn. Nov. 14, 2013) ("Most of the courts that have considered this peculiar procedural posture have stated that it is appropriate to apply the choice of law rules of the 'originating' jurisdiction (i.e., where the case would have [been] brought but for the CMO permitting direct filing), rather than the choice of law rules of the MDL Court.").

In prescription drug MDLs, the originating jurisdiction is the place where the drug was purchased and prescribed. *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,* 2011 WL 1375011, at *6 ("[T]he better approach is to treat foreign direct filed cases as if they were transferred from a judicial district sitting in the state where the case originated," which is "the state where the plaintiff purchased and was prescribed the subject drug."); *In re Avandia Mktg, Sales Practices & Prods. Liab. Litig.,* MDL No. 1871, 2012 WL 3205620, at *2 (E.D.Pa. Aug. 7, 2010) ("The Court has concluded, as have other MDL courts, that such cases should be governed by the law of the states where Plaintiffs received treatment and prescriptions for Avandia. This ruling will promote uniform treatment between those Plaintiffs whose cases were transferred into the MDL from their home states and those Plaintiffs who filed directly in the MDL.").

For cases that originate elsewhere and are directly filed into the MDL, I will follow the better-reasoned authority that applies the choice-of-law rules of the originating jurisdiction, which in our case is the state in which the plaintiff was implanted with the product. Here, the plaintiff was implanted with the product in Santa Maria, California. Therefore, California choice-of-law rules will govern the selection of the statute of limitations.

**\*5** California uses the governmental interest approach to analyze choice-of-law questions. *Wash. Mut. Bank v. Superior Court,* 15 P.3d 1071, 1080–81 (Cal.2001). Under this approach, the parties agree that the California statute of limitations would apply. Because the parties agree on this point, I will assume that it is not an issue. Therefore, I will apply the California statute of limitations

Sanchez v. Boston Scientific Corp., Slip Copy (2014)

2014 WL 202787

to determine whether Ms. Sanchez's claim is time-barred.

**III. Legal Standard**
To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88 (1986).

Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson,* 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson,* 477 U.S. at 252. Likewise, conclusory allegations or unsupported speculation, without more, are insufficient to preclude the granting of a summary judgment motion. *See Felty v. Graves Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987); *Ross v. Comm'ns Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985), *abrogated on other grounds, Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989).

**IV. Discussion**
In California, there is a two-year statute of limitations for personal injury actions. Cal.Civ.Proc.Code § 335.1. This statute applies to injuries involving defective products regardless of the legal theory asserted. *See, e.g., Soliman v. Philip Morris Inc.,* 311 F.3d 966, 971 (9th Cir.2002). The general rule is that a cause of action accrues when all of its elements are complete. *Fox v. Ethicon Endo–Surgery, Inc.,* 110 P.3d 914, 920 (Cal.2005). However, the discovery rule tolls accrual until the plaintiff "is aware of her injury and its negligent cause." *Jolly v. Eli Lilly & Co.,* 44 Cal.3d 1103, 1109 (1988). In other words, the statute begins to run "when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." *Id.* at 1110. "Wrong" is not used "in any technical sense, but rather in accordance with a lay understanding." *Id.* "The question when a plaintiff actually discovered or reasonably should have discovered the facts for purposes of the delayed discovery rule is a question of fact unless the evidence can support only one reasonable conclusion." *Ovando v. County of Los Angeles,* 159 Cal.App. 4th 42, 61 (2008).

**\*6** In a case involving both medical malpractice and products liability claims, the California Supreme Court has stated that "a plaintiff's ignorance of wrongdoing involving a product's defect will usually delay accrual because such wrongdoing is essential to that cause of action." *Fox,* 110 P.3d at 924. Simply put, "[t]he discovery rule does not trigger accrual of a cause of action unless the plaintiff has some reason to suspect wrongdoing; that is, when a plaintiff, through reasonably diligent investigation, discovers only that he has been injured but not that the injury may have a wrongful cause, then the clock has not yet begun to run." *Hendrix v. Novartis Pharm. Corp.,* No. CV–13–2402–MWF PLAX, 2013 WL 5491846, at \*5 (C.D.Cal. Oct. 2, 2013).

However, in order to use the discovery rule to delay accrual, the plaintiff must "plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Fox,* 110 P.3d at 921. In other words, "to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury. If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light." *Id.*

Boston Scientific argues that Ms. Sanchez had discovered the wrongful cause of her injuries more than two years before she filed suit. First, Ms. Sanchez had at least four revision surgeries, which should have put her on actual or inquiry notice that her symptoms were related to a problem with the mesh implants. In support of this contention, Boston Scientific cites *Coleman v. Boston Scientific,* No. 1:10–CV–01968–0WW, 2011 WL 3813173 (E.D.Cal. Aug. 29, 2011). In *Coleman,* the plaintiff was implanted with a Boston Scientific mesh product on December 5, 2006. *Id.* at \*1. "From July 2007 to March 2009, the plaintiff had surgery, vaginal reconstruction, and mesh removal in order to treat her 'recurrent symptoms of pelvic pain, erosion and recurrent infection of the tissue surrounding the mesh.' " *Id.* The

Sanchez v. Boston Scientific Corp., Slip Copy (2014)

2014 WL 202787

plaintiff filed suit more than two years after her July 2007 surgery. *See id.* The plaintiff argued she was not on notice until she had seen a 2008 FDA Notice regarding the possible defectiveness of the product. *Id.* at \*3. The United States District Court for the Eastern Division of California stated that

> A reasonable person who is implanted with a medical device, which requires a second corrective surgery to remove the device and correct injuries resulting there from within a year of implantation [,] should suspect the defectiveness of the device and conduct a reasonable inquiry and examination into the suitability of the device.

*Id.* Second, Boston Scientific claims that if Ms. Sanchez had consulted Dr. Wiltchik, her medical records, or the publicly available 2008 FDA Notice, she would have discovered that her injuries were related to a problem with the mesh.

\*7 The plaintiff counters that *Coleman* does not apply to this case because the court never found as a matter of law that the plaintiff had discovered the wrongful cause of her injury. In a footnote, the court noted that "[d]ue to the lack of detail concerning the nature of Plaintiff's 2007 surgery, it cannot be said as a matter of law that Plaintiff was on inquiry notice of her claims in 2007." *Id.* at \*3 n.1. Instead, the plaintiffs claim Ms. Sanchez had notice of the wrongful cause of her symptoms, i.e. product defect, when she observed a television advertisement about mesh litigation in August 2011. The plaintiffs argue that Ms. Sanchez did not initially suspect a defect caused her injuries because Dr. Wiltchik stated that her symptoms were related to her body's rejection of the mesh, not the mesh itself. In addition, the plaintiffs contend that Ms. Sanchez's nineteen visits with her physician, or an investigation of her medical records, would not have revealed this wrongful cause because Dr. Wiltchik did not suspect that Ms. Sanchez's injuries were caused by a defect in the mesh.

In other words, the plaintiffs claim that summary judgment is not appropriate because the record supports two inferences: First, Ms. Sanchez initially suspected that her symptoms was related to her body's rejection of the mesh and only in August 2011 did she discover her symptoms had a wrongful cause. Conversely, she knew after four surgeries, including a surgery under anesthesia, that something was wrong with the product, not her body, and thus was on inquiry notice.

For instruction on this point, the plaintiffs cite *Clark v. Baxter Healthcare Corp.,* 83 Cal.App. 4th 1048 (2000). In *Clark,* the plaintiff began experiencing allergic reactions to latex gloves starting in 1992. *Id.* at 1053. The plaintiff consulted with an allergist who suggested that the plaintiff was allergic to the gloves. *Id.* In May 1995, the plaintiff had a serious allergic response to the latex gloves. *Id.* at 1053. By the end of 1995, the plaintiff joined a support group. *Id.* The group gave her a flyer regarding latex allergies litigation, which indicated that there might be a defect in the latex gloves. *Id.* The plaintiff filed suit against the glove manufacturers on January 23, 1996. *Id.* The flyer was entered into the record, and the plaintiff submitted a declaration stating when she had received the flyer. *Id.* The defendants moved for summary judgment based on the statute of limitations. *Id.*

The California Court of Appeals found that there was a triable issue of fact because the record supported two reasonable inferences—(1) the plaintiff "could reasonably have inferred from the advice given her by various doctors and from the severity of the May 1995 acute reaction, caused by gloves she was not wearing, that more than a natural allergy to a natural substance was involved, and that a product defect or a contaminated product could have been a causative factor" or (2) "that she did not become aware of a potential wrongfulness component of her cause of action until more information than the existence of her allergies placed her on inquiry notice and then was actually gained." *Id.* at 1059–60. If the plaintiff identified the negligent cause of her injuries by May 1995, her action would be time-barred. However, if she was unaware of this negligent cause until the end of 1995, her claim was timely filed. Accordingly, the court denied the defendants' motion for summary judgment.

\*8 If I were permitted to weigh evidence at the summary judgment stage, it is unlikely that Ms. Sanchez would prevail. However, I am not a fact finder. Therefore, based on the record before me, I must reluctantly conclude that there is a genuine issue of material fact regarding when Ms. Sanchez suspected that wrongdoing caused her injuries.

On one hand, a jury might believe that Ms. Sanchez initially suspected the cause of her symptoms was related to her body's rejection of the mesh. Dr. Wiltchik never told Ms. Sanchez that her symptoms were caused by a defect in the mesh. In addition, Dr. Wiltchik never suspected that a defect could be causing Ms. Sanchez's symptoms. One could reasonably conclude that Ms. Sanchez's body simply "didn't like" the mesh. Ms. Sanchez may have continued to believe this to be the

Sanchez v. Boston Scientific Corp., Slip Copy (2014)

2014 WL 202787

cause of her symptoms until August 2011, when she allegedly viewed the television advertisement. The jury might reach this conclusion even though Ms. Sanchez's deposition testimony reveals she could not remember the exact date when she saw the advertisement. Thus, a jury could reasonably infer that Ms. Sanchez discovered the wrongful cause of injuries in August 2011 and thus timely filed her action.

On the other hand, a jury might conclude that after four revision surgeries, several medical treatments, and nineteen medical appointments, her body's rejection of the mesh was not a reasonable explanation of her symptoms. A reasonable person could conclude that the cause of Ms. Sanchez's injuries was a defect in the product, not her body's natural reaction to the mesh. Thus, a jury could infer that Ms. Sanchez discovered the wrongful cause of her injuries more than two years before filing suit. Therefore, her claim could be time-barred.

Assuming that Ms. Sanchez did suspect or should have suspected wrongdoing more than two years before filing, and thus had a duty to investigate, whether that investigation was reasonable is a more difficult issue. *See Fox,* 110 P.3d at 921 ("[A] potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury."); *Jolly,* 44 Cal.3d at 1111 ("Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her."); *Nelson v. Indevus Pharm., Inc.,* 142 Cal.App. 4th 1202, 1206 (2006) ("When the cases are read in whole, rather than in isolated quotes, it is clear that a plaintiff's duty to investigate does not begin until the plaintiff actually has a reason to investigate. A plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a factual basis for its elements. We look to whether the plaintiffs have reason to

at least suspect that a type of wrongdoing has injured them."(internal citations, quotations, and alterations omitted)).

**\*9** Because Dr. Wiltchik testified that she never told Ms. Sanchez her symptoms were due to a defect in the mesh, a jury could reasonably conclude that consultations with Dr. Wiltchik or a review of the medical records would not have given Ms. Sanchez a reason for suspicion of wrongdoing. (Exhibit 3 [Docket 32–3], Deposition of Dr. Kerri Wiltchik, at 223:17–21; 224:14–16; 224–225:23–11). While the evidence presented at trial may ultimately lead to a finding by the jury that Ms. Sanchez had a duty to investigate based on her multiple surgeries, there is enough of a material dispute to render summary judgment inappropriate.

For these reasons, I cannot determine as a matter of law that Ms. Sanchez discovered her cause of action more than two years before filing suit. Accordingly, I **DENY** Boston Scientific's motion for summary judgment. *See Ward v. Westinghouse Canada, Inc.,* 32 F.3d 1405, 1408 (9th Cir.1994) (applying California law) (factual issue regarding when plaintiff suspected wrongdoing not suitable for summary judgment).*See generally Sylve v. Riley,* 15 Cal.App. 4th 23, 26 (1993) ("Whether reasonable diligence was exercised is generally a question of fact precluding summary judgment.").

**V. Conclusion**

For the reasons discussed above, Boston Scientific's Motion for Summary Judgment [Docket 30] is **DENIED.**The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

Footnotes

1    Exhibits relating to Boston Scientific's memorandum in support of its motion for summary judgment shall be identified alphabetically.

2    Exhibits relating to the plaintiffs' response to Boston Scientific's motion for summary judgment will be referred to numerically.

3    Pretrial Order # 12 was amended by Pretrial Order # 14 [Docket 196] on September 26, 2012. Pretrial Order # 14 did not modify sections regarding direct filing into the MDL.

**Sanchez v. Boston Scientific Corp., Slip Copy (2014)**

2014 WL 202787

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3802804
Only the Westlaw citation is currently available.
United States District Court,
D. Nevada.

David SCHMIDT, Plaintiff,
v.
C.R. BARD, INC., et al., Defendants.

No. 2:11–CV–00978–PMP–PAL. | July 22, 2013.

**Attorneys and Law Firms**

Cal J. Potter, III, Potter Law Offices, Las Vegas, NV,
John R. Fabry, Mark R. Mueller, Breanne Vandermeer,
Mueller Law, Austin, TX, for Plaintiff.

Jay E. Smith, Las Vegas, NV, Kevin G. Lohman, Marilyn
A. Moberg, Michael K. Brown, Reed Smith, LLP, Los
Angeles, CA, Paul M. Haire, Smith Larsen & Wixom, Las
Vegas, NV, Eric L. Alexander, Reed Smith, LLP,
Washington, DC, Steven J. Boranian, Reedsmith, San
Francisco, CA, for Defendants.

*ORDER*

PHILIP M. PRO, District Judge.

**\*1** On April 18, 2007, Plaintiff David Schmidt underwent
laparoscopic bilateral hernia repair surgery during which
a 3DMax Mesh was inserted by surgeon Scott Gabriel,
M.D. The 3DMax Mesh used to treat Schmidt is made of
polypropylene, and is manufactured by Defendants C.R.
Bard, Inc. and Davol, Inc. Although polypropylene mesh
devices have been utilized in hernia surgery for many
years, Schmidt experienced a rare and severe
inflammatory reaction to the 3DMax Mesh device.
Ultimately, the 3DMax Mesh was removed from
Schmidt's groin in two surgeries. Thereafter, Schmidt
filed the instant law suit alleging numerous product
liability claims, essentially arguing that his injuries were
caused by a defect in the 3DMax Mesh, and that
Defendants failed to adequately warn regarding known
risks of treatment.

By their Motion for Summary Judgment (Docs. # 109, #
110 & # 114), Defendants contend that no genuine issue
of material fact remains and that in accord with Rule 56

of the Federal Rules of Civil Procedure, Defendants are
entitled to judgment as a matter of law with respect to
Plaintiff's remaining claims for failure to warn, design
defect, negligence, breach of implied warranty, and
deceptive trade practices. A hearing was conducted on
Defendant's Motion on April 25, 2013, following which
the Parties filed supplemental briefs (Docs. # 139 & #
142).

Defendants argue Plaintiff's failure-to-warn claims are
without merit because Defendant specifically warned of
the potential for complications from inflamation and
adhesions as well as the chronic pain which could result
from utilization of the 3DMax Mesh. Defendants argue
that the adequacy of their warnings is established as a
matter of law because Plaintiff has offered no expert, or
other evidence that the warnings provided were not
adequate. Moreover, Defendants insist Plaintiff's
failure-to-warn claim fails because Plaintiff has offered
no evidence to show that any inadequate warnings caused
Plaintiff's alleged injuries.

Defendants argue they are entitled to summary judgment
on Plaintiff's design defect claim, because Plaintiff's
designated expert offers no opinion on the design of the
3DMax Mesh, nor does Plaintiff's expert opine that the
design of the Mesh renders it unreasonably dangerous.
Additionally, Defendants assert that Plaintiff has offered
no evidence that any change in design of the 3DMax
Mesh would have prevented the injuries allegedly
sustained by Plaintiff. Hence, any injuries claimed by
Plaintiff could not be attributable to the particular design
of the 3DMax Mesh in question.

Defendants argue they are entitled to summary judgment
on Plaintiff's negligence and breach of implied warranty
claims because Plaintiff has failed to offer evidence of a
causal connection between Plaintiff's alleged injuries and
any representation, warranty, or breach of duty by
Defendants.

Finally, Defendants argue they are entitled to summary
judgment on Plaintiff's deceptive trade practices claim
under the Nevada Consumer Protection Act because
Defendants complied with all applicable governmental
regulations, and also because Plaintiff and his surgeon
admit that neither relied on any marketing, advertising,
labeling, or other material from Defendants prior to
Plaintiff's initial hernia repair surgery.

**\*2** Plaintiff rejects each of Defendants' arguments above
and contends he has marshaled substantial evidence to
support all of his claims, and at a minimum, enough

evidence to create at least genuine issues of material fact as to each of them.

As to Plaintiff's failure-to-warn claims, Plaintiff correctly states that manufactures who distribute products in Nevada are required to communicate to consumers the hazards associated with their products which are not genuinely known. *General Electric Co. v. Bush,* 88 Nev. 360, 365, 498 P.2d 366 (1972). However, the Court finds Plaintiff has failed to cite to evidence which that the warnings which accompanied the 3DMax Mesh surgically implanted in Plaintiff were inadequate. Even to the extent Plaintiff were permitted to rely on the unsworn expert report of Dr. Kevin Petersen, and it is not at all clear that he can do so, Dr. Petersen testified that he was not offering expert opinion regarding the adequacy of the warnings, and that he had never even reviewed the warnings that accompanied the 3DMax Mesh in question. Additionally, Plaintiff has offered no evidence that Dr. Gabriel, the surgeon who inserted the 3DMax Mesh into Plaintiff ever reviewed the warnings that accompanied the product. As a result, Plaintiff has failed to sustain his burden of showing the existence of genuine issues of material fact with respect to his failure-to-warn claim, and Defendants are entitled to summary judgment.

Plaintiff's design defect claim is similarly problematic. In his deposition testimony, Plaintiff's proposed medical expert, Dr. Petersen, concedes that he is not qualified to offer expert medical device design testimony. Neither does Plaintiff submit any evidence to show that the design of the 3DMax Mesh in question was the legal cause of the injuries alleged by Plaintiff. Neither is the Court swayed by Plaintiff's argument that the testimony of Dr. Petersen to the effect that Plaintiff's hernia repair could have been accomplished without use of the 3DMax Mesh. The fact that an alternative method of surgical hernia repair was potentially available does not support Plaintiff' design defect claim. As argued by Defendants, non-mesh repair is not an alternative design and does not meet Plaintiff's burden to support this particular claim.

The Court finds Plaintiff's claim for negligence must fail because Plaintiff has offered no sufficient evidence that the design of the 3DMax Mesh fell below the appropriate standard of care and further because Defendants have come forward with affirmative expert testimony that they acted as a reasonably prudent medical device manufacturer.

Plaintiff's implied warranty claim fails because Plaintiff has not presented evidence of proximate cause. Indeed the evidence shows that Dr. Gabriel reviewed no warnings which accompanied the 3DMax Mesh product at all, and there is no evidence that Dr. Gabriel would have done anything differently had the warnings accompanying Defendants' product been different.

**\*3** Lastly, Defendants' Deceptive Trade Practices Act claim fails because Plaintiff cannot prove justifiable reliance on any alleged deceptive or false representation on the part of Defendants. In fact, the record supports Defendants' position that neither Dr. Gabriel nor Plaintiff relied on any marketing, advertising, labeling, or other materials from Defendants prior to the implant surgery.

Finally, for the reasons set forth by Defendant's in their Response to Plaintiff's Sur-reply (Doc. # 142), the arguments and evidence offered in Plaintiff's Sur-reply (Doc. # 139) do not alter the Court's conclusion that Defendant's are entitled to Summary Judgment on each of Plaintiff's remaining claims.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. # 109, 110, & 114) is **GRANTED,** and that the Clerk of Court shall forthwith enter Judgment in favor of Defendant's and against Plaintiff.

**IT IS FURTHER ORDERED** that Defendant's Motion to Bifurcate Trial (Doc. # 100), is **DENIED.**

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...

2011 WL 1375011

2011 WL 1375011
Only the Westlaw citation is currently available.
United States District Court,
S.D. Illinois.

In re YASMIN AND YAZ (DROSPIRENONE)
MARKETING, SALES PRACTICES AND
PRODUCTS LIABILITY LITIGATION.
This Document Relates To: All Cases.

No. 3:09–md–02100–DRH–PMF. | MDL No. 2100.
| April 12, 2011.

## I. INTRODUCTION

DAVID R. HERNDON, Chief Judge.

**\*1** This matter is before the Court for the purpose of resolving choice of law considerations pertaining to the issues of attorney-client privilege and the work-product doctrine. To date, Bayer has produced just under 3 million documents (approximately 65 million pages), and has withheld 12,857 unique documents (18,808 documents counting duplicates) as shielded by attorney-client privilege. Of those unique documents, the Bayer defendants assert that 6,282 are also protected under the work-product doctrine. The plaintiffs have currently asserted a representative challenge with regard to 330 of the allegedly privileged documents. The Bayer defendants report that this challenge affects 243 unique documents, 52 of which are also allegedly protected under the work-product doctrine.

The parties have attempted to independently resolve the dispute over the 330 challenged documents but are at an impasse with regard to the standard that should be applied when assessing whether the documents are protected under either the attorney-client privilege or the work-product doctrine. The first step in resolving this resolving this matter includes assessing both vertical and horizontal choice of law questions. The parties have asked the Court to resolve these choice of law questions and to provide direction with respect to procedure for addressing the remainder of the disputed issues.

## II. BACKGROUND

This multidistrict litigation ("MDL") concerns the prescription drugs Yaz, Yasmin, and Ocella and involves cases originating in nearly every state in the country as well as the District of Columbia and the territory of Puerto Rico. The basis for the Court's jurisdiction in these coordinated proceedings is diversity. The claims brought by the plaintiffs are state based claims for which state law supplies the rule of decision. The Bayer defendants, however, have asserted several federally based defenses. As of the Last status conference, the Bayer defendants report that 5,998 MDL cases have been served.

The MDL cases originate from three sources: (1) cases filed directly in this MDL that originated in this Court's judicial district ("local cases"); (2) cases that have been transferred from another district court pursuant to 28 U.S.C. % 4f 1407 ("transfer cases"); and (3) cases that originated outside of this Court's judicial district and that were filed directly into the MDL ("foreign direct filed cases") pursuant to the Court's direct filing Order (MDL 2100 Docs 669 (original direct filing order), 1137(amended direct filing order), & 1462 (second amended direct filing order)).

## III. ANALYSIS

**A. Work–Product Doctrine**
The Bayer defendants contend that a portion of the documents are protected from discovery by the work-product doctrine. The work-product doctrine, established in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), is now codified in the Fed.R.Civ.P. 26(b)(3): "[A] party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative."The work-product doctrine is governed by federal law—even where the basis of federal jurisdiction is diversity. *See e.g., Pyramid Controls, Inc. v. Siemens Indus. Automations, Inc.,* 176 F.R.D. 269, 276 (N.D.Ill.1997) (Alesia, J.).

**\*2** Accordingly, with regard to documents allegedly protected under the work-product doctrine, federal law controls.

In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...

2011 WL 1375011

## B. Attorney–Client Privilege

### 1. Relevant Authority

#### a. Federal Rule of Evidence 501

Federal Rule of Evidence 501 provides the rule for determining which body of law governs matters of privilege. Thus, the Court's analysis begins with the text of Rule 501, which provides:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Fed.R.Evid. 501.

#### b. Rule 501: Legislative History, State Law Proviso, and Reliance on1 Advisory Committee Notes

##### i. Legislative History and the State Law Proviso

Originally, Article V of the Preliminary Draft of the Evidence Rules as proposed by the Advisory Committee consisted of thirteen rules recognizing specific privileges. 23 Charles Alan Wright & Kenneth Graham, Jr., *Federal Practice And Procedure: Evidence* § 5421. The proposed rule also made no provision for the application of state privilege law in diversity actions and clearly indicated that state privilege law should be disregarded. *Id.* This attempt to federalize the law of privilege was highly controversial and Congress consequently became actively involved in the rulemaking process. *See Id.*Congress "completely rejected" the Advisory Committee's privilege scheme, *id.,* and adopted the current version of Rule 501. *Id.*

The current version of Rule 501 was drafted by the House Judiciary Committee and includes a state law proviso designed to require the application of state privilege law in proceedings governed by *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). 23 Charles Alan Wright & Kenneth Graham, Jr., *Federal Practice And Procedure: Evidence* § 5421; Fed.R.Evid. 501 Advisory Committee Notes, H.R.Rep. No.93–650. In rendering its decision, the Court is mindful of the rationale underlying Rule 501's state law proviso:

> [The] rationale underlying the proviso is that federal law should not supersede that of the States in substantive areas such as privilege absent a compelling reason. The Committee believes that in civil cases in the federal courts where an element of a clam or defense is not grounded upon a federal question, there is no federal interest strong enough to justify departure from State policy.

**\*3** Fed.R.Evid. 501, Advisory Committee Notes, H.R.Rep. No. 93–650.

The Court also finds the review of the congressional history of Rule 501, provided by the Third Circuit Court of Appeals in an opinion authored by then Chief Judge Seitz in *Samuelson v. Susen,* 576 F.2d 546 (3rd Cir.1978) to be instructive on the matter. In *Samuelson,* the Third Circuit Court of Appeals explained that the congressional intent in enacting Rule 501 was to effectuate "state substantive rights, laws and policies in controversies where there is no substantial federal interest" and to preserve "the domain of state privilege law."*Id.* at 550.The court also noted that the decision to apply state privilege law in diversity actions was supported by the following contentions:

(1) privilege rules are and should continue to be considered substantive for Erie purposes;

(2) privilege rules are outcome determinative;

(3) where state law supplies the rule of decision, state rules of privilege should be applied because there is no federal interest substantial enough to justify departure from state policy; and

(4) state policy regarding privilege should not be thwarted merely because of diversity jurisdiction, a situation which, if allowed, would encourage forum

In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...

2011 WL 1375011

shopping.

*Id. citing* H.R.Rep. No. 650, 93rd Cong., 1st Sess. 9 (1973).

**ii. Reliance on the Advisory Committee Notes**
The Advisory Committee Notes that accompany Rule 501 consist of three reports: (1) House Report Number 93–650; (2) Senate Report Number 93–1277; and (3) Conference Report Number 93–1597. House Report Number 93–650 was drafted by the House Judiciary Committee and accompanied the House's version of Rule 501 when it was first sent to the House floor for consideration. 23 Charles Alan Wright & Kenneth Graham, Jr., *Federal Practice And Procedure: Evidence* § 5421. After approval by the House, the Senate Judiciary Committee considered the House's version of Rule 501. *Id.* The Senate Judiciary Committee, in Senate Report Number 93–1277, criticized certain provisions of the House's version of Rule 501 and proposed an amendment to the state law proviso contained therein. *Id.* The proposed amendment was approved in the Senate without any debate. *Id.*

The Senate's version of Rule 501 was then considered by the Conference Committee. *Id.* The Conference Committee ultimately rejected the Senate's version of Rule 501 opting instead to adopt Rule 501 as originally proposed by the House. *Id.* The Conference Committee's commentary explaining its reasoning and addressing some of the concerns that had been expressed in Senate Report Number 93–1277 is contained in Conference Report Number 93–1597. The House's version of Rule 501 was then adopted without further debate. *Id.*

Any reliance this Court places on the Advisory Committee Notes that accompany Rule 501 is done in light of the legislative history discussed above. Of particular note, is the fact that the commentary in Senate Report Number 93–1277 was made in reference to the Senate's version of Rule 501 which was rejected by the Conference Committee and therefore may not be an accurate indicator of Congressional intent with regard to Rule 501 as it was ultimately enacted. *See* 23 Charles Alan Wright & Kenneth Graham, Jr., *Federal Practice And Procedure: Evidence* § 5434 n. 15 & n. 17 (criticizing courts for relying on the Senate Report as evidence of congressional intent).

**c. Rule 501 and Diversity Cases**
**\*4** Pursuant to Rule 501, "with respect to an element of a

claim or defense as to which State law supplies the rule of decision," matters of privilege are to "be determined in accordance with State law." Fed.R.Evid. 501. This proviso has consistently been interpreted as requiring application of state privilege law in diversity based actions. *See* 2 Paul R. Rice & John B. Corr, *Attorney–Client Privilege in the U.S.* § 12:16 (2010). *See also Dunn v. Washington County Hosp.,* 429 F.3d 689, 693 (7th Cir.2005) (in a federal question case the Appellate Court noted that Illinois "peer review" privilege would not apply because state privilege only applies in diversity based actions); Fed.R.Evid. 501, Advisory Committee Notes ("The proviso is designed to require the application of State privilege law in civil actions and proceedings governed by *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938)").

When Rule 501 requires application of state privilege law and there are factual connections to more than one state, federal courts apply state choice of law rules to determine which state's privilege law controls.[1] Generally, a federal court sitting in diversity applies the choice of law rules emanating from the state in which it sits. *Tanner v. Jupiter Realty Corp.,* 433 F.3d 913, 915 (7th Cir.2006). When a case is transferred, however, the transferee court applies the choice of law rules of the state in which the transferor court sits. *Chang v. Baxter Healthcare Corp.,* 599 F.3d 728, 732 (7th Cir.2010). There is no controlling authority addressing this matter with regard to cases that (1) are directly filed in an MDL pursuant to a direct filing order and (2) originated outside of the MDL court's judicial district.[2]

**d. Rule 501 and Cases Involving Federal and State Claims or Defenses**

**i. Federal question cases and pendent state law claims**
The Seventh Circuit has held that in federal question cases federal privilege law applies even when the information sought would also be relevant to a pendent state claim. *Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058, 1061 n. 3 (7th Cir.1981). In so holding, the Appellate Court reasoned that "it would be meaningless to hold the communication privileged for one set of claims and not the other." *Id.*[3]

**ii. Diversity cases with state based claims and one or more federally based defenses**
The Court's research reveals no Seventh Circuit authority addressing the controlling privilege law in diversity actions based on state causes of action that also involve federally based defenses.

In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...

2011 WL 1375011

The Advisory Committee Notes to Rule 501, however, provide some guidance in this matter. Pursuant to the Conference Committee's Report, "If an item of proof tends to support or defeat a claim or defense, or an element of a claim or defense, and if state law supplies the rule of decision for that claim or defense, then state privilege law applies to that item of proof."Fed.R.Evid. 501, Advisory Committee Notes, Conf. Rep. No. 93–1597. Conversely, in diversity cases "where a claim or defense is based upon federal law.....federal privilege law will apply to evidence relevant to the federal claim or defense."*Id*.[4]

**\*5** There is no clear congressional intent with regard to whether federal or state privilege law should govern when, in a diversity action, an item of proof is relevant to both federal and state elements. *See* 23 Charles Alan Wright & Kenneth Graham, Jr., *Federal Practice And Procedure: Evidence* § 5434 (although the Senate Judiciary Report proposes application of the law favoring reception of the evidence, the Conference Committee Report is silent on the issue).

**2. Analysis**

**a. Illinois choice of law principles do not control simply because this MDL Court is sitting in diversity in Illinois**

Plaintiffs contend that, because this Court is sitting in diversity in Illinois, Illinois is the forum and Illinois choice of law principles control. Plaintiffs' argument is incorrect because this MDL involves thousands of cases, many of which did not originate in this judicial district. As noted above (section II), cases in this MDL originate from three sources: (1) cases filed directly in this MDL that originated in this Court's judicial district ("local cases"); (2) cases that have been transferred from another district court pursuant to 28 U.S.C. § 1407 ("transfer cases"); and (3) cases that originated outside of this Court's judicial district and that were filed directly into the MDL ("foreign direct filed cases") pursuant to the Court's direct filing Order (MDL 2100 Docs 669 (original direct filing order), 1137 (amended direct filing order), & 1462 (second amended direct filing order)).

In the event that state law governs privilege matters in this MDL, the governing choice of law rules will depend on each case's source of origin. As to the local cases, Illinois choice of law rules control. *Tanner v. Jupiter Realty Corp.,* 433 F.3d 913, 915 (7th Cir.2006). As to transfer cases, however, Illinois choice of law rules are not controlling.[5]Instead, the choice of law rules that govern

are the rules of the jurisdiction from which each case was transferred. *Chang v. Baxter Healthcare Corp.,* 599 F.3d 728, 732 (7th Cir.2010).

As to the foreign direct filed cases, the choice of law decision is not as clear. Foreign direct filed cases are filed in this Court pursuant to a direct filing order (Case Management Order Number 9).[6] This agreed order authorizes the direct filing of cases that originated outside of this judicial district. The order expressly provides that the parties' direct filing agreement will not impact the choice of law that otherwise would apply to the direct filed actions.

In general, direct filing orders are beneficial to both parties because they streamline the litigation and help to eliminate the judicial inefficiency involved in the MDL transfer process. *See* Eldon Fallon, *Bellweather Trials in Multidistrict Litigation,* 82 Tul. L.Rev. 2323, 2353 (2008) (the direct filing procedure "eliminates the judicial inefficiency that results from two separate clerk's offices having to docket and maintain the same case and three separate courts (the transferor court, the MDL Panel, and the transferee court) having to preside over the same matter."). However, direct filing orders also present difficult choice of law issues. *See e.g., In re Express Scripts, Inc., PBM Litig.,* MDL No. 1672, 2007 WL 4333380, at * 1–2 (E.D.Mo. Dec. 7, 2007) (not reported) (Limbaugh, J.) (applying the choice-of-law rules of the MDL forum to foreign case that was directly filed in the MDL); *In re Bausch & Lomb Inc. Contacts Lens Solution Prods. Liab. Litig.,* MDL No. 1785, 2007 WL 3046682, at *3 (D.S.C. Oct. 11, 2007) (Norton, J.) (noting that "it would be an odd result to subject plaintiffs to [the law of the MDL forum] simply because they took advantage of the direct filing procedure—a procedure that provides benefits to all parties and preserves judicial resources").

**\*6** The Court concludes that the better approach is to treat foreign direct filed cases as if they were transferred from a judicial district sitting in the state where the case originated. For purposes of this analysis, the Court considers the originating state to be the state where the plaintiff purchased and was prescribed the subject drug. Thus, for a foreign direct filed member action involving a plaintiff that purchased and was prescribed the subject drug in Tennessee, the Court will treat that plaintiff's claims as if they were transferred to this MDL from a district court in Tennessee.

**b. Wholesale Application of Federal Attorney–Client Privilege Law**

In the instant case, application of state attorney-client

privilege is a daunting task that involves considering the choice of law principles of all fifty states (as well as the District of Columbia and Puerto Rico) (*see* sections III(B)(1)(c) & III(B) (2)(a)). The Bayer defendants argue that engaging in such an analysis would be overly burdensome and contend that an appropriate alternative is the wholesale application of federal law. In support of their argument, the Bayer defendants point to the procedure utilized in the *Vioxx* MDL and outlined in *In re Vioxx Products Liability Litigation,* 501 F.Supp.2d 789 (E.D. La 2007) (Fallon, J.).[7]

In the *Vioxx* litigation, a discovery dispute arose regarding the defendant's claim of attorney-client privilege over approximately 500,000 pages of documents. The *Vioxx* court appointed Professor Paul R. Rice, an expert in privilege law, to review a representative sample of 2,000 documents withheld by the defendant and to make recommendations on whether the defendant's claims of privilege should be upheld. *Id.* at 789–795.During this process, Professor Rice applied federal privilege law standards, taking into account (1) "the law of attorney-client privilege both in general and in the context of [the *Vioxx* ] multidistrict litigation" and (2) standards "common to all definitions of the attorney-client privilege."*Id.* at 794–795.

In the instant case, the Court is reluctant to follow the path taken by the *Vioxx* MDL. The *Vioxx* MDL's jurisdiction was based on diversity and the claims asserted by the plaintiffs turned on questions of state law. The *Vioxx* decision, however, does not address its reasoning for applying federal privilege law or Rule 501's state law proviso.

As discussed above (*see* sections III(B)(1)(b)(i); III(B) (1)(c); and III(B)(1)(d)), Rule 501 is designed to require the application of state privilege law in actions based on questions of state law between citizens of different states. Nothing in Rule 501 indicates that federal privilege standards may be applied wholesale to state question diversity proceedings simply because application of state privilege standards would be overly burdensome. In fact, the rationale underlying Rule 501 and its congressional history, which emphasize the view that privilege law is substantive and that federal law should not supersede that of the state law in diversity actions absent a compelling reason,[8] militate against the wholesale application of federal law for purposes of convenience (*see* section III(B)(1)(b)).

**\*7** Further, although the Seventh Circuit has held that federal law applies in federal question cases (even where the same evidence is relevant to a pendent state claim),

*Shadur,* 664 F.2d at 1061 n. 3, the Seventh Circuit has not had occasion to address the wholesale application of federal law in diversity actions premised on state law claims.

Finally, the Conference Committee Report that accompanies Rule 501 indicates that in diversity actions based on questions of state law, a bifurcated approach is contemplated; privilege matters relevant to state claims or defenses will be governed by state privilege law and privilege matters relevant to federal claims or defenses will be governed by federal privilege law (*see* sections III(B)(1)(b)(i) & III(B)(1)(d)(ii)).

Accordingly, for the reasons discussed above, the Court finds that: (1) privilege matters that are relevant to an element of a claim or defense will be governed by federal privilege law; and (2) privilege matters that are relevant to an element of a claim or defense for which state law supplies the rule of decision will be governed by state privilege law.

#### c. Privileged Material Relevant to Both Federal and State Elements

This Court's decision may result in a scenario where the same privileged material is deemed relevant both to a state claim and a federal defense.Rule 501 does not expressly address what law must be applied in such a scenario. The Senate Report proposes that in diversity actions when the same evidence is relevant to state and federal elements, the "rule favoring reception of the evidence should be applied."Fed.R.Evid. 501 Advisory Committee Notes S.R. No. 93–1277. The Conference Committee Report, however, is silent on the issue and Congressional intent is therefore unclear.Fed.R.Evid. 501 Advisory Committee Notes C.R. No. 93–1597.

The Seventh Circuit has not directly addressed the issue. However, in *Estate of Suskovich v. Anthem Health Plans of Virginia, Inc.,* 553 F.3d 559, 570 (7th Cir.2009), the Appellate Court indicated that it would favor application of the approach proposed by the Senate Judiciary Committee. *See Estate of Suskovich,* 553 F.3d at 570 (noting with approval the district court practice of applying Federal Rule of Evidence 601, which creates a broad presumption of competency, when the evidence relates to state and federal claims and finding that the practice is consistent with the approach proposed by the Senate Judiciary Committee in Rule 501's Advisory Committee Notes). In addition, as discussed in section III(B)(1)(d)(i) above, in *Memorial Hospital for McHenry County v. Shadur,* 664 F.2d 1058, 1061 n. 3 (7th Cir.1981), the Appellate Court held that in a federal

In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...

2011 WL 1375011

question case, where the same evidence is relevant to both state and federal elements, federal privilege law should govern because "it would be meaningless to hold the communication privileged for one set of claims and not the other."*Id.*

**\*8** Considering the above, the Court concludes that if the allegedly privileged material is relevant to both federal and state elements, the privilege law favoring admission shall govern (assuming of course there is a difference between the relevant federal and state privilege laws).

**d. When state law applies, section 139 of the Second Restatement will govern choice of law considerations**
As noted, to determine which state's privilege law governs, the Court must look to state choice of law principles. In the instant case, this requires considering the choice of law principles applicable in all fifty states, the District of Columbia, and Puerto Rico. After conducting this analysis[9] and for the reasons outlined below, the Court concludes that section 139 of the Restatement (Second) Conflict of Laws (1971) ("Second Restatement") will apply to privilege matters governed by state law in this MDL.

The Court's research reveals that a majority of states have not established a choice of law doctrine regarding privileges. Courts that have analyzed conflicting privilege laws, however, tend to favor application of the most significant relationship test found in section 139 of the Second Restatement or of a similar test favoring application of the law of the state with the most significant relationship with the privileged communication—such as the law of the state where the communication is centered.

Of those jurisdictions that do not appear to have considered the issue (and therefore have not had occasion to accept or reject section 139), the majority (1) apply the Second Restatement to one or more other areas of law or (2) apply an interest based analysis that reflects the principles underlying section 139 of the Second Restatement. Given that these jurisdictions do not have a firmly established rule with regard to resolving privilege choice of law matters and these jurisdictions have applied the Second Restatement or a similar interest based analysis to other conflict of law issues, the Court concludes that, if presented with the issue, courts in these jurisdictions would apply the privilege law of the state with the most significant relationship to the communication and would be guided in that decision by the principles found in section 139 of the Second Restatement.

Finally, a small minority of jurisdictions continue to follow the traditional choice of law principles largely reflected in the original Restatement (First) of Conflict of Laws (1934) ("First Restatement"). The First Restatement, however, does not specifically address how privilege choice of law matters should be resolved. Under the First Restatement, matters are either substantive or procedural and procedural matters are to be governed by the law of the forum. Sections 596 and 597 of the First Restatement, specifically provide that the law of the forum governs issues of "the competency and credibility of witnesses" and the "admissibility of a particular piece of evidence."The Attorney-client privilege, however, is not a rule of competency or credibility. Nor can it be classified as a procedural rule.[10]

**\*9** Because the First Restatement does not address this issue and because these jurisdictions do not appear to have otherwise established rules for assessing privilege choice of law matters, the Court believes that the proper conflicts rule and the rule which would be applied by these jurisdictions is section 139 of the Second Restatement.

**e. Section 139 of the Second Restatement—relevant considerations**
The Second Restatement provides that the state with the most significant relationship with the communication is usually the state where the communication took place, *i.e.,*"the state where an oral interchange between persons occurred, where a written statement was received or where an inspection was made of a person or thing."Restatement (Second) of Conflict of Laws § 139, Comment e (1971).

Further, under the Second Restatement, if a communication is privileged in the state to which it bears the most significant relationship, but not privileged in the forum, the law of the state with the most significant relationship to the communication will apply if there is a special reason not to apply the law of the forum. *See*Restatement (Second) of Conflict of Laws § 139. Factors to be considered in assessing whether a special reason exists include:

> (1) the number and nature of the contacts that the state of the forum has with the parties and with the transaction involved, (2) the relative materiality of the evidence that is sought to be excluded, (3) the kind of privilege involved and

(4) fairness to the parties.

Restatement (Second) of Conflict of Laws § 139, Comment d (1971). In addition, where the contacts with the forum are "few and insignificant" then the forum will likely apply the law of the state with the most significant relationship with the communication. *Id.* Finally, "fairness to the parties is another important consideration."Fairness to the parties requires consideration of the parties' reasonable expectations of confidentiality which were likely based on the law of the state which has the most significant relationship to the communication. *See Id.*

Considering the above, in the Court's view, where the communication at issue is between individuals foreign to the forum, whose relationship is centered outside of the forum, and whose communications regard subject matter not centered in the forum, a special reason exists for not applying the law of the forum and the law of the state with the most significant relationship to the communication should be applied. Accordingly, in the instant case, where state privilege law applies, the Court expects that in most if not all instances the law of the state with the most significant relationship to the communication will govern the existence and scope of attorney-client privilege.

**f. State Choice of Law Principles**
Courts in thirteen states, the District of Columbia, and Puerto Rico, have adopted section 139 and/or have cited with approval provisions of section 139 when resolving privilege choice of law issues:

**\*10** 1. **Colorado:***See People v. Thompson, 950 P.2d 608, 611 (Colo.App.1997)* (concluding that section 139 provided the appropriate framework for analyzing the issue of marital privilege).

2. **Delaware:***See 3Com Corp. v. Diamond II Holdings, Inc., 2010 WL 2280734, \*5 (Del. Ch.2010 May 31, 2010)* (not reported) (applying section 139 to an attorney-client privilege issue).

3. **District of Columbia:***See Independent Petrochemical Corp. v. Aetna Cas. and Sur. Co. 117 F.R.D. 292, 295–296 (D.D.C.1987)* (because the District of Columbia typically applies an "interest analysis" approach and relies on the Second Restatement for other choice of law matters it would likely adopt section 139 for privilege matters).

4. **Illinois:***See Allianz Ins. Co. v. Guidant Corporation,*

869 N.E.2d 1042, 1048–1049 (Ill.App.2007) (section 139 governs issue of attorney-client privilege); *Sterling Finance Management, L.P. v. UBS PaineWebber, Inc., 782 N.E.2d 895, 903–904 (Ill.App.2002)* (same).

5. **Iowa:***See State v. Eldrenkamp, 541 N.W.2d 877 (Iowa 1995)* (looking to section 139 for guidance on privilege issue).

6. **Kentucky:***See Saleba v. Schrand, 300 S.W.3d 177, 181–183 (Ky.2009)* (applying section 139 to privilege issue).

7. **Maine:***See State v. Lipham, 910 A.2d 388, 392 n. 3 (Me.2006)* (considering section 139 when assessing choice of law issue regarding marital privilege).

8. **Ohio:***See Woefling v. Great–West Life Assur. Co., 285 N.E.2d 61, 221 n. 2 (Ohio App.1972)* (finding that Illinois physician-patient privilege controlled and citing to § 139).

9. **Minnesota:***See State v. Heaney, 689 N.W.2d 168, 175–177 (Minn.2004)* (applying the most significant relationship approach of section 139 to privilege choice of law analysis).

10. **New York:***See Brandman v. Cross & Brown Co. of Florida, Inc., 479 N.Y.S.2d 435, 436–437 (N.Y.Sup.1984)* (referencing section 139 and stating that the attorney-client privilege is substantive for purposes of choice of law and New York courts will apply the law of the state with the more significant contacts).*See also Mazella v. Philadelphia Newspapers, Inc., 479 F.Supp. 523 (D.C.N.Y.1979)* (Neaher, J.) (applying New York choice of law principles; considering section 139 and applying Pennsylvania privilege law because the communication was centered in Pennsylvania).

11. **Pennsylvania:***See James Talcott, Inc. v. C.I.T. Corp.,*14 pa. D & C.3d 204, 206 (Pa.Com.Pl.1980) (referencing section 139 and applying the accountant-client privilege law of the state with the most significant relationship to the communication).*See also Samuelson v. Susen, 576 F.2d 546, 551 (3rd Cir.1978)* (Pennsylvania courts have adopted the "interest analysis" approach to conflict questions and therefore would apply the privilege law of the state with the most significant relationship to the privileged communication—particularly when there was no connection between the communication and the forum).

**\*11** 12. **Puerto Rico:***See Mitsui & Co. (U.S.A.) Inc.*

In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...

2011 WL 1375011

*v. Puerto Rico Water Resources Authority,* 79 F.R.D. 72 (D.C. Puerto Rico) (Toledo, C.J.) (considering relevant case law and section 139 of the Restatement; concluding that New York law governed the issue of accountant privilege because New York was the state with the most significant relationship to the privileged communication).

13. **Texas:***See Alez v. State,* 45 S.W.3d 101, 103–106 (Tex.Crim.App.2001) (applying section 139 to privileged communication issue).

14. **Washington:***See State v. Donahue,* 18 P.3d 608, 611 (Wash.App.Div.2001) (applying section 139 to physician-patient privilege);

15. **Wisconsin:***See State v. Kennedy,* 396 N.W.2d 765, 769–770 (Wis.App.1986) (relying on section 139 of the Restatement (Second) and concluding that Wisconsin's physician-patient privilege controlled).

As to the jurisdictions that do not appear to have considered privilege issues in the choice of law context, research indicates that twenty-three look to the Second Restatement for guidance when resolving choice of law questions in one or more other areas of law:

1. **Alaska:***See Savage Arms, Inc. v. Western Auto Supply Co.,* 18 P.3d 49, 53 (Alaska 2001) (generally, Alaska courts look to the Second Restatement in resolving choice of law issues).

2. **Arizona:***See Bryant v. Silverman,* 703 P.2d 1190, 1191–1192 (generally, Arizona has adopted the Second Restatement for choice of law issues).

3. **Connecticut:***Jaiguay v. Vasquez,* 948 A.2d 955, 972–973 (Conn.2008) (Connecticut has adopted the significant relationship test of the Second Restatement for personal injury actions noting that "[c]hoice of law must not be rendered a matter of happenstance, in which the respective interests of the parties and the concerned jurisdictions receive only coincidental consideration).

4. **Florida:***See Bishop v. Florida Specialty Paint Co.,* 389 So.2d 999, 1000–1001 (Fla.1980) (adopting the significant relationship test of Second Restatement for personal injury actions and noting that the court would not apply the law of a state with no connection to the issue).*See also Anas v. Blecker,* 141 F.R.D. 530, 531–533 (M.D.Fla.1992) (Wilson, J.) (concluding that because Florida courts consistently look to the Second Restatement in resolving conflict issues, Florida courts would also apply section 139 to resolve choice of law

issues regarding privilege); *Wolpin v.. Philip Morris Inc.,* 189 F.R.D. 418, 424 (C.D.Cal.1999) (Florida courts would apply section 139 to privilege conflict of law issue) (Paez, J.).

5. **Idaho:***See Seubert Excavators, Inc. v. Anderson Logging Co.,* 889 P.2d 82, 85 (Idaho 1995) ("Although never adopted in full, this Court has opted in favor of applying the most significant relationship test set forth in the [Second Restatement].").

6. **Massachusetts:** See *Cosme v. Whitin Mach. Works, Inc.,* 632 N.E.2d 832, 834 (Mass.1994) (in general, choice of law matters are resolved by considering various "choice influencing considerations," including those provided in the Second Restatement).

***12 7. Michigan:***See Compuware Corp. v. Moody's Investors Services, Inc.,* 222 F.R.D. 124, 130–131 (E.D.Mich.2004) (Feikens, J.) (noting that Michigan has adopted the Second Restatement for contract issues and a two-step interest analysis in tort cases then applying both section 139 and Michigan's two-step interest analysis to resolve disputed privilege issues)

8. **Mississippi:***See McDaniel v. Ritter,* 556 So.2d 303, 310 (Miss.1989) (Second Restatement applies to torts); *Zurich American Ins. Co. v. Goodwin,* 920 So.2d 427, 433 (Miss.2006) (Second Restatement applicable to contracts).*See also Barnes v. A Confidential Party,* 628 So.2d 283, 288 (Miss.1993) (indicating a preference for application of the law of the state where communication took place).

9. **Missouri:***See Kennedy v. Dixon,* 439 S.W.2d 173, 184–185 (Mo.1969) (adopting section 145 of the Second Restatement); *Goede v. Aerojet General Corp.,* 143 S.W.3d 14, 25–26 (Mo.App. E .D.2004) (applying the significant relationship test of the Second Restatement); *Byers v. Auto–Owners Inc. Co.,* 119 S.W.3d 659, 663 (Mo.App.S.D.2003) (applying sections 188 and 193 of the Second Restatement).

10. **Montana:***See Phillips v. General Motors Corp.,* 995 P .2d 1002, 1007–1007 (Mont.2000) (adopting Second Restatement for tort issues); *Tenas v. Progressive Preferred Ins. Co.,* 197 P.3d 990, 994–995 (Mont.2008) (as to contract issues, Montana courts generally follow the Second Restatement).

11. **Nebraska:***See Erickson v. U–Haul Intern.,* 767 N.W.2d 765, 772–773 (Neb.2009) (Nebraska looks to the Second Restatement for guidance when resolving choice of law issues).

12. **New Hampshire:**See *Glowski v. Allstate Ins. Co.,* 589 A.2d 593, 595 (N.H.1991) (looking to the Second Restatement when "choice influencing considerations" do not provide enough guidance).

13. **New Jersey:**See *P.V. ex rel. T.V. v. Camp Jaycee,* 962 A.2d 453, 455 (N.J.2008) (applying the most significant relationship standard of the Second Restatement to tort related issue).

14. **Nevada:***General Motors Corp. v. Dist. Ct.,* 134 P.3d 111, 116 (Nev.2006) (holding that the "Second Restatement's most significant relationship test governs choice-of-law issues in tort actions unless another, more specific section of the Second Restatement applies to the particular tort").

15. **Oklahoma:**See *Bernal v. Charter County Mut. Ins. Co.,* 209 P.3d 309, 315 (Okla.2009) (generally lex loci rules are applied in contract actions, however, where motor vehicle insurance contracts are involved, Oklahoma courts will consider whether another state has a more significant interest); *Brickner v. Gooden,* 525 P.2d 632 (Okla.1974) (adopting the most significant relationship test of the Second Restatement in tort actions).

16. **Oregon:**See *Spirit Partners, LP v. Stoel Rivers LLP,* 157 P.3d 1194, 1200 (Or.App.2007) (applying the most significant relationship test of the Second Restatement to tort claims); *M*

*W Zander, U.S. Operations, Inc. v. Scott Co. of California,* 78 P.3d 118, 121 (Or.App.2003) (applying the Second Restatement to contract claim).

**\*13** 17. **Rhode Island:**See *Najarian v. National Amusements, Inc .,* 768 A.2d 1253, 1255 (R.I.2001) (applying Rhode Island's "interest-weighing" approach in deciding choice of law issue but also looking to Second Restatement for guidance).

18. **South Dakota:**See *Burhenn v. Dennis Supply Co.,* 685 N.W.2d 778, 784 (S.D.2004) (South Dakota applies the significant relationship test of the Second Restatement to resolve choice of law concerns);

19. **Tennessee:**See *Hataway v. McKinley,* 830 S.W.2d 53, 59 (Tenn.1992) (Tennessee will follow the "most significant relationship" approach of the Second Restatement for conflicts questions in tort cases).

20. **Utah:**See *Waddoups v. Amalgamated Sugar Co.,* 54 P.3d 1054, 1059 (Utah 2002) (Utah applies the Second Restatement when resolving choice of law

issues).See also *Hercules, Inc. v. Martin Marietta Corp.,* 143 F.R.D. 266, 268–269 (D.Utah 1992) (predicting that Utah would look to section 139 for assessing privilege choice of law issues because Utah has applied the significant contacts analysis of the Second Restatement in other areas of law).

21. **Vermont:**See *McKinnon v. F.H. Morgan Co., nc.,* 750 A .2d 1026, 1028–128 (Vt.2000) (in Vermont, most significant relationship test of Second Restatement is applied to tort claims); *Pioneer Credit Corp. v. Carden,* 245 A.2d 891, 894 (Vt.1968) (applying Second Restatement to resolve choice of law issue pertaining to contract).

22. **West Virginia:**See *Lee v. Saliga,* 373 S.E.2d 345, 351–352 (W.Va.1988) (discussing West Virginia's history of applying the Second Restatement to contract matters).

23. **Wyoming:**See *R & G Elec., Inc. v. Devon Energy Corp.,* 53 Fed. Appx. 857, 859 (10th Cir.2002) (Wyoming follows the Second Restatement approach in resolving choice of law questions).

Research indicates that another six jurisdictions apply an interest analysis that reflects principles found in the Second Restatement when addressing other choice of law matters.

1. **Arkansas:**See *Crisler v. Unum Insurance Co. of America,* 233 S.W.3d 658, 660 (Ark.2006) (in contract dispute applying the law of the state with the most significant relationship); *Ganey v. Kawasaki Motors Corp., U.S.A.,* 234 S.W.3d 838, 846–847 (Ark.2006) (choice of law matters in tort are resolved by considering both the doctrine of lex loci delecti and the five "choice-influencing considerations" promulgated by Professor Robert A. Leflar; in rendering its decision the court also considered which state had a more significant relationship to the issue in question).

2. **California:**See *Wolpin v. Philip Morris Inc.,* 189 F.R .D. 418, 423–424 (D.D.Cal.1999) (Paez, J.) (applying California's governmental interest analysis to determine which state had the most significant connection with a confidential study; considering factors such as residence of study participants and involvement of California Department of Health Services in collecting data).

**\*14** 3. **Hawaii:**See *Peters v. Peters,* 634 P.2d 586, 593 (Hawaii 1981) ("The preferred analysis, in our

opinion, would be an assessment of the interests and policy factors involved with a purpose of arriving at a desirable result in each situation.").

4. **Indiana:**See *Hubbard MFG. Co., Inc. v. Greeson,* 515 N .E.2d 1071 (Ind.1987) (in torts Indiana follows a modified version of the "lex loci delicti" rule; if the place of the tort is an insignificant contact the court may consider other factors including the place where the relevant relationship is centered); *Hartford Acc. Indem. Co. v. Dana Corp.,* 690 N.E.2d 285 (Ind.Ct.App.1997) (in contract actions Indiana applies the law of the state with the most significant contacts).

5. **Louisiana:**See Article 3515 of the Louisiana Civil Code codifies a choice of law analysis that considers each states relationship to the parties and the dispute, including consideration of the "policies of upholding the justified expectations of parties").

6. **North Dakota:**See *Johnson v. Johnson, 617 N.W.2d 97, 123 (N.D.2000) (applying a significant contacts approach coupled with "choice influencing considerations" to contracts choice of law issues); Nodak Mut. Ins. Co. v. Wamsley, 687 N.W.2d 226, 231 (N.D.2004) (applying Second Restatement to choice of law issues in tort).*

Finally, the Court's research reveals eight states who continue to follow the traditional choice of law principles largely reflected in the original Restatement (First) of Conflict of Laws (1934) ("First Restatement").

1. **Alabama:**See *Lifestar Response of Alabama, Inc. v. Admiral Ins. Co.,* 17 So.3d 200, 213 (Ala.2009) (Alabama generally follows conflict of law principles of *lex loci contractus* and *lex loci delicti* ).

2. **Georgia:**See *Convergys Corp. v. Keener,* 582 S.E.2d 84 (Ga.2003) (declining to adopt the Second Restatement and continuing to apply a more traditional approach).

3. **Kansas:**See *Aselco, Inc. v. Hartford Ins. Group,* 21 P .3d 1011,*rev. denied*272 Kan.—— (2001) (applying traditional choice of law analysis).

4. **Maryland:**See *Hauch v. Connor,* 453 A.2d 1207, 1209 (Md.1983) (declining to adopt the Second Restatement for tort choice of law matters); *American Motorists Ins. Co. v. Artra Group, Inc.,* 659 A.2d 1295, 1301 (Md.1995) (Maryland has not adopted the significant relationship test of the Second Restatement but has cited with approval

other provisions of the Second Restatement). The United States District Court for the District of Maryland has, on two occasions, concluded that, as to matters of privilege, Maryland courts would apply section 139 of the Second Restatement).*See Saint Annes Development Co., LLC v. Trabich,* 2009 WL 324054, *2 (D.Md. Feb. 9, 2009) (Bredar, Mag.); *Hill v. Huddleston,* 263 F.Supp. 108 (D.Md.1967) (Thomsen, C.J.).

5. **New Mexico:**United Wholesale Liquor Co. v. Brown–Forman Distillers Corp., 775 P.2d 233, 235 (1987) (noting "New Mexico adheres to a traditional conflicts of law analysis contained in Restatement (First) of Conflicts of Law (1934)").*But c.f. Ideal v. Burlington Resources Oil & Gas Co. LP,* 233 P.3d 362, 369 (N.M.2010) (noting that the New Mexico Supreme Court recently rejected the First Restatement approach as too rigid and inflexible in multi-state contract class actions; adopting instead the "more appropriate" Second Restatement approach).

**\*15** 6. **North Carolina:**See *Gbye v. Gbye,* 503 S.E.2d 434, 435–436 (N.C.1998) (North Carolina adheres to a traditional choice of law approach in tort actions); *Computer Sales Intern., Inc. v. Forsyth Memorial Hosp., Inc.,* 436 S.E.2d 263, 265 (N.C.App.1993) (law of the place where the contract is made governs its interpretation)
7. **South Carolina:**See *Menezes v. WL Ross Co. LLC,* —— S .E.2d ——, 2011 WL 1118841, 3 (S.C.App.2011 March 23, 2011)

8. **Virginia:**See *Jones v. R.S. Jones & Assocs.,* 431 S.E.2d 33, 34 (Va.1993) ("Virginia applies the doctrine of lex loci delicti, meaning the law of the place of the wrong governs all matters related to the basis of the right of action."); *Buchanan v. Doe,* 431 S.E.2d 289, 291 (Va.1993) (under Virginia "conflict of law rules: (1) the law of the place of the wrong determines the substantive issues of tort liability, and (2) generally, the law of the place where an insurance contract is written and delivered controls issues as to its coverage.") (internal citations omitted).

## IV. CONCLUSION AND SUMMARY OF FINDINGS

Having considered the parties' arguments, the relevant authority, and for the reasons stated herein, the Court **ORDERS** as follows:

In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...

2011 WL 1375011

1. Federal law will govern whether documents are protected under the work-product doctrine.

2. The confidentiality of communications that are relevant to an element of a federal defense will be governed by federal attorney-client privilege law.

3. The confidentiality of communications relevant to an element of a claim or defense for which state law supplies the rule of decision will be governed by state privilege law.

4. The confidentiality of communications relevant to both federal and state elements will be governed by the law favoring reception of the evidence.

5. Choice of law considerations for matters governed by state privilege law

a. Section 139 of the Second Restatement will govern the choice of law decision for matters governed by state privilege law.

b. As the Court interprets section 139 of the Second Restatement, vindication of the parties' reasonable expectations of confidentiality is a "special circumstance" warranting application of the law of the state with the most significant relationship to the communication. Thus, where the communications at issue are between individuals foreign to the forum, whose relationship is centered outside of the forum, and whose communications regard subject matter not centered in the forum, the forum's privilege law is not controlling.

6. The parties are directed to meet and confer as specified in section V below.

## V. MEET AND CONFER PROCESS

In light of the Court's decision resolving the choice of law considerations, the Court directs the parties to meet and confer, for a period not to exceed seven days, with respect to the confidentiality of the 330 disputed documents. The parties should attempt to independently reach an agreement regarding the 330 disputed documents by applying the principles discussed in this order. If the parties are unable to resolve this matter independently, the parties shall submit briefing relevant to any remaining disputes over the 330 disputed documents. The briefing shall include: (1) a list of documents as to which disputes remain over claims of attorney-client privilege and work-product; (2) position statements addressing the disputes which remain over claims of attorney-client privilege and work-product; and (3) defendants' privilege logs.

**\*16 SO ORDERED.**

Footnotes

[1] Professor Paul Rice, the attorney-client privilege expert appointed in the *Vioxx* litigation, addresses this concept in his treatise on attorney-client privilege law in the United States. *See* 2 Paul R. Rice & John B. Corr, *Attorney–Client Privilege in the U.S.* § 12:17 (2010) (noting that Rule 501's directive to apply state privilege law "intersects with the *Erie* doctrine" and requires the application of state choice of law rules in determining which state's privilege law controls).

[2] In addition, the agreed order entered in this MDL that allows for direct filing expressly states that the parties' agreement to permit direct filing would not impact the choice of law that otherwise would apply to the direct filed actions (MDL 2100 Docs 669 (original direct filing order), 1137(amended direct filing order), & 1462 (second amended direct filing order)).

[3] The Advisory Committee Notes that accompany Rule 501 expressly state ("[in] Federal question civil cases, federally evolved rules on privilege should apply since it is Federal policy which is being enforced. *It is also intended that the Federal law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case"* ).Fed.R.Evid. 501, Advisory Committee Notes, S.Rep. No. 93–1277 (emphasis added). A number of courts have relied on this statement in concluding that federal question cases involving pendent state claims are governed by federal privilege law. This statement, however, is contained in the senate report that accompanies Rule 501 and was made in reference to the senate's version of Rule 501. The Conference Report is silent on the issue and, as a result, congressional intent is unclear. Accordingly, as to the issue of what law governs pendent state law claims in federal question cases, the Court relies on Seventh Circuit authority and not the commentary contained in senate report No. 93–1277.

[4] This portion of the Conference Report appears to reject the position taken by the Senate Judiciary Committee regarding what constitutes an "element" of a claim or defense. *See* 23 Charles Alan Wright & Kenneth Graham, Jr., *Federal Practice And Procedure: Evidence § 5434* (pursuant to the Conference Report "it makes no difference whether the supposedly privileged matter is direct or circumstantial evidence of a state claim; if it is in a line of proof that culminates in an element of a state claim or

In re Yasmin and Yaz (Drospirenone) Marketing, Sales..., Not Reported in...

2011 WL 1375011

defense, then state rules of privilege apply").

5    This is not the first time this issue has arisen in this MDL. The Court has explained, in previous MDL decisions, that transfer cases are not governed by Illinois choice of law principles. *See e.g., In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Relevant Products Liability Litigation,* 2010 WL 3937414, *4 (S .D.Ill.)(S.D.Ill., Oct. 4, 2010) (Herndon, C.J.); *In re Yasmin and Yaz (DROSPIRENONE) Marketing, Sales Practices and Products Liability Litigation,* 2010 WL 1963202, *2 (S.D.Ill. May 14, 2010)* (Herndon, C.J.).

6    MDL 2100 Docs 669 (original direct filing order), 1137(amended direct filing order), & 1462 (second amended direct filing order).

7    Jurisdiction in the *Vioxx* litigation was diversity based and the coordinated proceedings involved cases that originated in jurisdictions across the country. *Vioxx,* 501 F.Supp.2d at 789–790.

8    The House Report also states "where an element of a claim or defense is not grounded upon a federal question, there is no federal interest strong enough to justify departure from State policy."Fed.R.Evid. 501 Advisory Committee Notes, H.R. No. 93–650.

9    The Court provides a detailed review of the relevant case law from these jurisdictions in section III(B)(2)(f) below.

10    The Court notes that some courts have concluded that the issue of attorney-client privilege is procedural in nature and have therefore applied the law of the forum. *See e.g., Union Planters Nat'l Bank v. ABC Records, Inc.,* 82 F.R.D. 472 (W.D.Tenn.1979). The Court does not rely on these decisions because Federal Rule of Evidence 501 rejects the notion that the attorney-client privilege issue is procedural. Fed.R.Evid. 501 Advisory Committee Notes, H.R. 93–650. As was well said by the Second Circuit Court of Appeals in *Republic Gear Co. v. Borg–Warner Corp.,* 381 F.2d 551, 555 n. 2 (2d Cir.1967):

> [A] rule of privilege is unlike the ordinary rules of practice which refer to the processes of litigation, in that it affects private conduct before the litigation arises. Rules of privilege are not mere housekeeping rules which are rationally capable of classification as either substantive or procedural for purposes of applying the doctrine of [*Erie* ] Such rules 'affect people's conduct at the stage of primary private activity and should therefore be classified as substantive or quasi-substantive.

> (internal citations omitted). The Court also notes that if it were to treat any state's attorney-client privilege as merely procedural that state's privilege law could not be applied because federal courts sitting in diversity are required to adhere to federal rules of procedure.

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.